**Darion INGRAM and Kevin Dobbins, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 03–CF–1475, 04–CF–89.**

District of Columbia Court of Appeals.

Argued Jan. 28, 2010.
Decided April 5, 2012.

Peter H. Meyers, Washington, DC, appointed by this court, for Darion Ingram.

Steven R. Kiersh, Washington, DC, appointed by this court, for Kevin Dobbins.

John V. Geise, Assistant United States Attorney, with whom Channing D. Phillips, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Elizabeth Trosman, Bruce R. Hegyi, and Glenn S. Leon, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, RUIZ, Associate Judge, RETIRED,* and TERRY, Senior Judge.

RUIZ, Associate Judge, Retired:

Kevin Dobbins and Darion Ingram were each convicted after a lengthy trial of two counts of unarmed second-degree murder, D.C.Code § 22–2103 (2001), as lesser-included offenses of armed first-degree (premeditated) murder and first-degree (felony) murder, in connection with the killing of Kenneth Muldrow, who died after he was viciously beaten and sexually assaulted.[1]

Appellants Dobbins and Ingram raise several claims of trial court error, none of

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired on September 1, 2011.

1. Appellants, along with co-defendants, Raq D. Baxter, Lamont Kenney, Matthew Ingram and Jamar Brown, had been indicted for: first-degree sexual abuse while armed, in vio-

which, we hold, prejudiced them so as to warrant reversal of their convictions. (1) Dobbins argues that the trial court should have severed his trial from his co-defendants or redacted a confession Baxter made that inculpated Dobbins before it was introduced at their joint trial; (2) Ingram and Dobbins argue that the trial court's erroneous aiding and abetting jury instruction allowed the jury to convict them of second-degree murder without finding that they possessed the necessary *mens rea*; (3) Ingram argues that the trial court erred when it denied his motion for a new trial after he proffered newly discovered evidence that a co-defendant, whose acquittal removed his Fifth Amendment privilege, was willing to testify that Ingram was not involved in Muldrow's murder. Finally, both appellants argue that their two second-degree murder convictions merge.

We affirm, but remand the case for vacation of the duplicative convictions and resentencing because, as the government concedes, appellants cannot stand convicted of two murders for the killing of one person.

## I. Facts

### A. The Government's Evidence.

On the night of December 8, 2000, Kenneth Muldrow was murdered by a group of men who brutally beat and sexually assaulted him over the span of approximate-ly forty-five minutes. Muldrow was 19 years old, a special needs student who had recently been hospitalized for head trauma. Baxter approached Muldrow as he and a companion, Franklin Boyd, were walking toward the Benning Road, N.E. Metro stop. Boyd testified that Baxter accused Muldrow of stealing his "stash" and then told him that he would have to pay or fight him. Muldrow, distressed, confused, and unable to speak coherently, responded he did not know what Baxter was talking about. Baxter struck Muldrow in the head with a bottle of "Remy" liquor, and after Muldrow collapsed to the ground, Baxter punched him in the face. Boyd saw a second person punch Muldrow, a third person kick him, and then heard members of a gathering crowd telling Baxter, "that's what you was talking about, that's the nigger that owe you."

In addition to Boyd, eight witnesses testified at trial about the brutal attack on Muldrow: Carlos Hawkins, Ray Williamson, Tanya Mathis, Gale Turner, Jacqueline Pollard, Duane Hankins, Michelle Tingling–Clemmons, and Stephanie Lewis. Hawkins lived in the first floor apartment located at 4607 Central Avenue N.E., and on the evening of December 8, 2000, he was sitting in his living room when he heard "a lot of commotion" outside. He looked out of a window and saw Ingram and Dobbins beating a man of "small stature." [2] According to Hawkins, Dobbins

lation of D.C.Code §§ 22–3002, –4502 (2001); first-degree (felony) murder while armed, in violation of D.C.Code §§ 22–2101, –4502; and first-degree (premeditated) murder while armed, in violation of D.C.Code §§ 22–2101, –4502. Co-defendants Kenney, Matthew Ingram and Brown were acquitted of all charges.

Baxter was convicted of first-degree sexual abuse while armed, first-degree felony murder while armed, and second-degree murder while armed (as a lesser-included offense of first-degree premeditated murder) in violation of D.C.Code §§ 22–2103, –4502. Upon receipt of a joint suggestion of Baxter's death, the court issued an order on February 4, 2011, dismissing his appeal and remanding his case to the Superior Court with directions that his convictions be vacated and his prosecution abated by reason of death. *See Howell v. United States*, 455 A.2d 1371, 1372 (D.C. 1983) (en banc).

2. Chief Medical Examiner for the District of Columbia Dr. Jonathan Arden testified that Muldrow was five feet four inches tall and weighed 128 pounds.

and Ingram were "wildly punching and kicking" the victim, who was not fighting back. Hawkins left his window to call the police. When Hawkins returned to the living room window, the attack had moved closer to his apartment. Three people— Hawkins identified them as Dobbins, Ingram and Baxter—continued to "punch[ ] and beat" Muldrow. Hawkins briefly left the window to make a second phone call to the police. When Hawkins returned to the window, he saw that Baxter, Dobbins, and Ingram were punching and kicking the victim on the ground right below Hawkins's air conditioning unit. The force of the blows was causing the air conditioning unit to vibrate. Hawkins left the window to make a third and final phone call to the police. Hawkins then heard Baxter ask, "where was the pole at . . . he was going to show people how he do [with] people who fuck with his stash and his money." A few seconds of silence followed and Hawkins heard "the boy say 'Oh God' and take his last breath." Baxter said: "[I]t's up in there, joint up in there," and then, "let me wipe this pole off." A short time later, officers from the D.C. Metropolitan Police Department arrived on the scene. Hawkins came out of his apartment and saw Muldrow lying on the ground, under the window of his apartment, in the same location where he had seen Baxter, Dobbins, and Ingram stomping and kicking him. Muldrow's inert body was "bloody with the pole stuck out of his anus."

Around 10:30 p.m. on the evening Muldrow was beaten and killed, Ray Williamson was parking his car on his way to Charles Simpkins's apartment in the building next door to Hawkins, at 4609 Central Avenue, N.E., when he noticed three or four young men "stomping something in

the shrubberies" near Smith's apartment.[3] Williamson watched from his car, which was about twenty to thirty feet away from the group, and at first thought the men at the wall had cornered a rat and were killing it; however, he then saw a man (Muldrow) stand up from the ground, apparently dazed, attempting to raise his hands and defend himself. Williamson testified that a man then walked up to Muldrow and punched him in the face, causing him to fall back down to the ground. One of the men continued to kick and stomp the man on the ground for approximately ninety seconds, and then stopped and walked to and from a nearby alley, twice passing within a few feet of Williamson's car. Williamson identified that man in court as Baxter. Williamson testified that Baxter then retrieved a trash can, and used it to strike Muldrow at least twice. Baxter then went into the apartment building, returned a few seconds later carrying a metal pole, and hit Muldrow several times with the pole. Williamson got out of his car and went into Smith's apartment, attempting to not make eye contact with the men. Williamson heard someone say that they could not leave the body on the sidewalk and saw two men dragging the body back toward the building.

Four persons who were at Charles Simpkins's apartment that night—Tanya Mathis, Gale Turner, Jacqueline Pollard, and Duane Hankins—testified that they saw part of the attack or its immediate aftermath. Mathis[4] testified that she was sitting in the living room with a group of people when Dobbins came in and said that Muldrow was outside. Baxter and Ingram immediately left the apartment upon hearing this news. Mathis watched

---

Williamson conceded he was "buzzed" after having a few drinks and some "Bacardi," but said that he was "not blind" and did not feel impaired by the alcohol.

Mathis testified that she had smoked a "dime bag" of marijuana that day, but said she felt "all right."

from the doorway, and saw Baxter hit Muldrow on the side of the head with an empty "Remy" bottle and then punch him three times with his fist.[5] Muldrow, who did not fight back, fell to the ground. Baxter then dragged Muldrow over to an area of bushes by the side of the apartment building. Baxter returned to Simpkins's apartment, picked up a bluish-green glass lamp, and struck Muldrow three or four times in the head. Mathis testified that Muldrow's face was cut and bloody, and he was moaning. Baxter then came back into the apartment, grabbed an "upright vacuum cleaner" from behind a door, and used it to strike Muldrow three or four times in the head and face. Baxter dragged Muldrow to the sidewalk, went over to a nearby alley, picked up a green plastic bucket, used it to strike Muldrow in the face about four times, and then dragged Muldrow back to the bushes where he continued to punch and kick him in the face. At this point, she saw Lamont Kenney hit Muldrow "a couple of times" in the face with his fist, and Dobbins hit Muldrow "about four times" and then kick him in the face. Mathis then retreated into the living room of the apartment, sat on a couch facing away from the windows,

and did not look out again to see the rest of the attack. She did, however, see Baxter come into the apartment again, get a "yellow stick," and go back outside. After five to fifteen minutes, Baxter returned to the apartment with what appeared to Mathis to be blood on his hands. After Baxter washed his hands in the bathroom, he left the apartment through the back door. Mathis woke Gale Turner,[6] telling her that "they" had beaten someone up outside and it would be best to leave before the police got there. Mathis and Turner, accompanied by Pollard, left the apartment through the back door.

A few days after the murder, Mathis testified, Baxter told her that "Kenny took a stash from me so that's why I did him like that." Around the same time, Mathis noticed that Baxter was wearing sneakers she had seen him remove from Muldrow's feet during the attack. Mathis also noticed that during this time period, Baxter would occasionally run around holding a stick in front of the area of his genitalia and laugh.

Jacqueline Pollard had known Muldrow from the time that he was nine years old. She was a frequent visitor to Simpkins's apartment and was familiar with Baxter,

---

**5.** Mathis testified that "Darious," who she identified as Darion Ingram, "Puck," who she identified as Jamar Brown, and "Matt," who she identified as Matthew Ingram, were standing on the porch with her at this time.

**6.** Gale Turner did not observe the attack because she was in her room in Simpkins's apartment after she had "smoke[d] some [ ] crack and drank some [ ] liquor." She testified that on that evening, Mathis rushed into her room to tell her that "they're outside messing up the dude," and suggested that Turner leave before the police arrived. Turner then left the apartment through the back door. Turner testified that as she was leaving the apartment, or possibly when she returned to the apartment a short time later, she saw Baxter in or near the bathroom, and he said, "Gale, I messed this dude up; do you want to

come outside and see him?" Turner then saw Baxter washing blood off his hands.

Shortly after Muldrow's death, Turner noticed that a blue ceramic lamp that she had owned and had kept in the living room of the apartment was missing. When she went outside, she saw what appeared to be pieces of the lamp on the ground. Baxter later told Turner that he would replace the lamp. In court, Turner identified Government Exhibit 16, which was recovered near the crime scene shortly after the murder, as remnants of her lamp. Turner also recalled that a vacuum cleaner that had been in the apartment before December 8, 2000 was no longer there after that day. She described items shown in Government Exhibits 58, and 59, photos taken from in front of 4609 Central Avenue, N.E. on December 9, 2000, as parts of the missing vacuum cleaner.

Ingram and Dobbins. She testified that on December 8, 2000, she was at Simpkins's apartment with appellants and a number of other people when Dobbins came into the apartment and said something to Baxter about Muldrow stealing his "stash." Pollard remembered that approximately two months earlier, she had seen Ingram and two of his brothers in a confrontation with Muldrow during which Ingram called Muldrow a "bitch." After Dobbins notified everyone that Muldrow was outside, Baxter, Ingram and Matthew Ingram left the apartment.[7] Pollard went to the front porch of the apartment and saw Baxter, Ingram, and Matthew Ingram striking and kicking Muldrow while he was on the ground as the crowd around Muldrow screamed "bitch, mother-fucker, punk." She saw Muldrow's teeth "c[o]me all out of [his] mouth." Baxter jumped several times from the top of a parked van onto Muldrow's body. Assisted by Ingram and Matthew Ingram, who were shouting, "do it, do it," Baxter then pulled down Muldrow's pants, and put a pole "up his rectum."

Duane Hankins[8] also saw the attack on Muldrow. Hankins had left Simpkins's apartment and was walking towards a nearby Exxon gas station when he looked back towards the apartment. He saw Baxter punch someone in the face. The victim then fell to the ground, and others, including Ingram and Dobbins, went up and kicked him. Hankins saw the group "kick" and "stomp" the victim about twenty-five times.

Michelle Tingling–Clemmons, who lived at 4614 Central Avenue, N.E., was asleep in her second floor bedroom and got up to use the bathroom when she was awakened by noises outside, followed by male voices and the sound of "someone getting hit." Tingling–Clemmons got out of bed, looked out of her window, and saw two men standing over a third man while one of them kicked the man on the ground. Tingling–Clemmons was not wearing her glasses so she could not see who the attackers were, but she did notice that one of the men was wearing what appeared to be Timberland boots.

### B. *The Defense Evidence.*

Baxter took the stand in his own defense and called an investigator, Willie Brown, who testified about measurements he took at the crime scene. Baxter testified that on the evening of December 8, 2000, he was at Simpkins's apartment, but went outside to see a fight between two other people that did not involve Muldrow. After observing that fight, Baxter sat on the street, and saw Muldrow, whom he suspected of stealing $300 from him, walking by. Baxter and Muldrow exchanged vulgarities and Baxter instigated a fight. Baxter struck Muldrow with his fist a number of times, and while Muldrow was lying on the ground, Baxter hit him a few more times. There, according to Baxter, the fight came to an end. Although Muldrow continued to lie on the ground, he had a coherent conversation with Baxter. When Baxter left, Muldrow was "talking and alive." Baxter denied striking Muldrow with a bottle, stomping or jumping on Muldrow, assaulting him with a pole or going back into Simpkins's apartment after the fight. Baxter did not see anyone else strike, assault, or otherwise attack Muldrow.

7. References to "Ingram" are to appellant Darion Ingram. To avoid confusion, acquitted co-defendant Matthew Ingram is referred to by his full name or as "Matthew." Appellant Ingram and Matthew Ingram are cousins.

8. Hankins testified that he was at Simpkins's apartment drinking "Remy Martin," but was not drunk, though he did feel "tipsy."

Baxter also called Stephanie Lewis, who saw the assault on Muldrow. Lewis testified that she remembered "somewhat, not a lot" of what happened during the attack because she was "spaced out" and "cloudy" as a result of her using "crack" that day. Because Lewis could not recall the facts of the incident, the substance of her testimony was entered through impeachment by reading her grand jury testimony. Before the grand jury, Lewis said that Muldrow had entered Simpkins's apartment, gone into the kitchen with Ingram, and then left because she told him to "get your faggy ass out of here." Lewis then followed Muldrow outside and saw "all of them but Raq [Baxter]" hitting Muldrow "all over" "quite a few" times. She then saw Darion Ingram hit Muldrow "with a pole," and Matthew Ingram hold Muldrow down to "try[ ] and get his money out of his pocket and he wouldn't give it to him." Lewis's trial and grand jury testimony was vague as to who used the pole to sexually assault Muldrow. In response to a grand jury question asking what Darion Ingram had done with the pole (which Lewis could not recall at trial), she had said that, "Matt pulled him, was pulling his pants down ... and just kept hitting him around the back, the back of the butt, and then he just stuck it up there."

Ingram called one witness in his defense: his mother, Willie Mae Ingram. She testified that Ingram came home around 11:00 p.m. on the night of December 8, 2000, and remained at home for the rest of the night. She said that his eyes were red and that she had wiped off what appeared to be glass fragments from around his eyes; she did not take Ingram for medical care.

Dobbins called three witnesses in his defense: his mother, Nadine Dobbins, his step-father, Anthony Skinner, and Michael Gainter. Dobbins' mother testified that Dobbins wore a size twelve. Skinner testified that on May 13, 2002, police officers removed a pair of shoes from his apartment that belonged to his wife, Nadine Dobbins. Dobbins also introduced, through stipulation, a portion of the grand jury testimony of Gainter, who was present at Simpkins's apartment on the night of the killing. Gainter testified that he did not see Dobbins there.

C. *The Government's Rebuttal Evidence.*

In rebuttal, MPD Detective Ray Crawford testified about the investigation of Muldrow's murder, including the questioning of Baxter. A videotape of Baxter's statement to the police, which is discussed at length in Section II. A, was introduced at trial.

The jury found Baxter guilty of first-degree sexual abuse while armed, first-degree felony murder while armed, and second-degree murder while armed. Dobbins and Ingram were each found guilty of two counts of unarmed second-degree murder, as lesser-included offenses of the first-degree murder charges, and acquitted of sexual abuse. Ingram was sentenced to concurrent terms of twenty years' imprisonment on each of the two counts of unarmed second-degree murder, five-years of supervised release, and a fine of $200 pursuant to the Victims of Violent Crime Compensation Act (VVCCA). Dobbins was sentenced to concurrent terms of fifteen years' imprisonment on each of the two counts of unarmed second-degree murder, five-years of supervised probation, and a $100 fine pursuant to VVCCA. Baxter, Ingram and Dobbins filed timely appeals.[9]

9. As noted, Baxter's appeal was dismissed, and his convictions vacated. See note 1, *su-*

## II. Analysis

### A. *Admission of Baxter's Unredacted Confession.*

Dobbins asserts that the trial court erred by failing to *sua sponte* sever his trial from that of his co-defendants because he was prejudiced by the admission of Baxter's unredacted confession in which he inculpated Dobbins in Muldrow's murder. On appeal, the government concedes that Baxter's unredacted statement should not have been admitted. *See Brisbon v. United States,* 957 A.2d 931, 953–54 (D.C. 2008). The government contends, however, that because defense counsel failed to move for severance or to object to the admission of Baxter's unredacted confession on this precise ground, plain error review applies; appellant does not argue otherwise. There was no plain error, the government argues, because there was other "powerful" evidence that was properly admitted against Dobbins, and the trial court cautioned the jury not to use Baxter's confession against any other co-defendant. Based on our review of the record, counsel *arguably* preserved the objection, in which case the proper standard of review would be for harmless error under *Kotteakos v. United States,* 328 U.S. 750, 756, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Our decision does not turn on the standard of review, however. We conclude that although the trials should have been severed, or only a redacted version of Baxter's confession admitted, we can say with "fair assurance"—in light of the trial court's instructions, the evidence arrayed against Dobbins, and the jury's verdict— that the erroneous admission of Baxter's

unredacted confession did not "substantially sway" the jury to convict Dobbins of unarmed second-degree murder. *Id.*

Baxter made his statement on March 22, 2001, when he was taken to the police station to discuss Muldrow's murder. Baxter initially denied having any knowledge of Muldrow's murder, but later admitted limited involvement in the assault. According to Baxter's statement, Muldrow stole money from him at Simpkins's apartment. On the evening of December 8th, Baxter encountered Muldrow on the street and a fight ensued over the stolen cash. Baxter struck Muldrow with his fist four times; he then withdrew from the fight and had no further contact with Muldrow. This part of the statement coincided with this testimony at trial. In the statement he gave to police, however, Baxter added that he then saw Matthew Ingram, Ingram, and Dobbins punch Muldrow; that Dobbins jumped several times from a railing onto Muldrow's head, struck Muldrow with a vacuum cleaner, and continued to beat him with it; that Matthew Ingram then got a stick from Simpkins's apartment, which he used to beat Muldrow and then shoved into Muldrow's "butt." Baxter's statement to the officers was videotaped.

At a pre-trial hearing, the government requested that it be allowed to introduce Baxter's unredacted statement in its case-in-chief. In response, Dobbins's counsel, along with counsel for a number of the other defendants, filed motions *in limine* to preclude admission of Baxter's statement, to sever their trials from Baxter's trial, or to redact the statement.[10] De-

---

*pra.*

**10.** Dobbins argued that a suitable redaction might be impossible. His motion *in limine* argued that "to be admissible at trial, Ba[xt]er's statements would have to be redacted so as to eliminate not only any refer-

ence to Mr. Dobbins by name (or nickname), but also any reference at all to Dobbins's alleged role in the offense" because it "directly incriminates Mr. Dobbins ... [and] would impermissibly infringe [upon] Mr. Dobbins's constitutional rights under the Confrontation Clause of the Sixth Amendment."

fense counsel argued that admission of Baxter's statement would create a *Bruton* violation because Baxter's confession would implicate his co-defendants in Muldrow's murder and Baxter would not be available for cross-examination. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (reversing conviction where co-defendant's confession was admitted but declarant did not take the stand and was thus not available for cross-examination, in violation of the co-defendant's Sixth Amendment right to confront the witnesses against him). The court and the parties agreed to work to produce a redacted transcript of Baxter's statement that could be admitted in the government's case-in-chief. The government, however, chose not to use Baxter's redacted transcript in its case-in-chief. Baxter then took the stand in his own defense.

At trial, Baxter reiterated part of what he had said in this original statement with respect to his own involvement, that he had punched Muldrow only a few times; but he recanted his earlier statement implicating Dobbins and Ingram in the vicious assault. He tried to explain away the contradictions between his videotaped statement and his trial testimony, by saying that he initially gave the police the same version he had testified to at trial, but they refused to accept it. He said that the police simply fed him the information about the other co-defendants, which he felt pressured to repeat in his own statement.

■ After Baxter testified, the prosecutor said the government intended to use Baxter's unredacted videotaped statement in cross-examination, pointing out that because Baxter had taken the stand, redaction of the statement (what the prosecutor called a *"Brutonized* version") was "no longer an issue." At that point, counsel objected, saying, "that's not the way I see[ ] it . . ." and argued that the videotape should not be admitted because at the pretrial hearing, the trial court had given the government a choice, whether it wanted to use a transcript or a videotape, and the government had chosen to use a redacted transcript. Counsel "renew[ed his] objection, . . . renew[ed his] motion to suppress the statement."[11] The trial court, having "had plenty of time" to consider the situation the previous evening after Baxter had taken the stand, allowed the government to use the unredacted videotape.

■ "For purposes of error preservation, objections at trial must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he is being asked to rule." *Paige v. United States*, 25 A.3d 74, 81 (D.C.2011) (citation omitted). Counsel had clearly stated a Confrontation Clause objection in the pretrial motion *in limine*, and counsel continued to object even after Baxter took the stand and became available for cross-examination, because the government had already opted to present a redacted transcript instead of the videotape. To the extent defense counsel did not alert the judge to the precise (and legally proper) basis for their continuing objection that we now discuss, it should have been apparent to the prosecutor, as well as to the court, that Baxter's unredacted confession incul-

---

11. We impute this objection also to Dobbins. "When one co-defendant makes an objection at trial which the other co-defendant does not join, the latter can nonetheless benefit from the objection, on appeal, when it applies equally to his or her own situations." *Johnson v. United States*, 756 A.2d 458, 462 n. 2

(D.C.2000); *Bayer v. United States*, 651 A.2d 308, 311 n. 1 (D.C.1994). In this case, Dobbins was clearly inculpated by Baxter's unredacted statement, so the objection by his co-defendant's counsel was directly relevant to him.

pating the co-defendants was inadmissible in a joint trial even after Baxter became available for cross-examination.

 Baxter's taking the stand obviated a *Bruton* issue, but the confession was nonetheless inadmissible because "under the traditional rules of evidence, it constitutes inadmissible hearsay and has no legitimate probative force against the non-confessing codefendant." *Carpenter v. United States*, 430 A.2d 496, 500 (D.C. 1981) (en banc) (citing *Sousa v. United States*, 400 A.2d 1036, 1043 (1979)). The trial court, in exercising its discretion to sever, "must weigh prejudice to the defendant caused by the joinder against the important considerations of economy and expedition of judicial administration." *Id.* at 502. Although "some amount of prejudice will be permitted in favor of judicial economy and the concomitant expedition of cases[,] ... once a severance issue is presented the court has a continuing duty to take adequate measures to guard against unfair prejudice from joinder." *Id.* at 500–1; *see Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *United States v. Wilson*, 434 F.2d 494, 499–500 (1970). Specifically, the trial court must take "appropriate steps to ensure that a defendant is not prejudiced by testimony as to a confessing co-defendant's out-of-court statement." *Carpenter*, 430

A.2d at 500–501. The court has two options: to redact the statement to delete all references to the non-confessing co-defendant, or to sever the trials. *Id.* at 502 (citing *Smith v. United States*, 312 A.2d 781, 788 (D.C.1973)). We emphasized again in *Geter v. United States*, 929 A.2d 428 (D.C.2007), that the court must either redact the testifying co-defendant's confession "to eliminate all incriminating references to the codefendant, or the codefendant's motion [to sever] must be granted—whether or not the defendant who made the statement takes the stand and testifies," *id.* at 431 (applying *Carpenter* to use of unredacted statement in cross-examination), and we have reversed convictions where the defendant was prejudiced by admission of a co-defendant's unredacted confession. *See id.; Brisbon*, 957 A.2d at 954–957.

 Here, the trial court clearly erred in allowing Baxter's videotaped confession to be played in its entirety—without redacting the parts that inculpated his co-defendants—as part of the government's impeachment of Baxter. The trial court did take care to instruct the jury on three separate occasions that it could consider the statement only as impeachment evidence against Baxter.[12] But we have cautioned that limiting instructions will "almost never [be] an acceptable alternative

---

12. First, during cross-examination, before the videotape was played, the court instructed as follows:

[government counsel] is referring to a previous statement made to the police and the other lawyers have referenced it also, you may be seeing a videotape of that statement. This statement may not be considered as evidence against anybody, is being introduced to you only to assess the defendant's credibility, only to assess his truthfulness, it is not evidence of any crime against the defendant or anyone else and you cannot consider it as such and it would be improper to do so.

A second time, in its final instructions, the court repeated the admonition:

[c]ertain evidence was admitted only with respect to a particular defendant and not

against any other defendant. You may consider such evidence only with respect to the defendant against whom it was offered. You must not consider it in any other way. So, you must not consider it in any way in your deliberations with respect to any other defendant. ...

A statement constitutes evidence only against the defendant making it. It is not evidence against any other defendant. You must not consider it in any way in determining the guilt or innocence of any other defendant.

The court cautioned the jury a third time, during jury deliberations. The jury sent a note to the trial judge asking for a video player—Baxter's counsel opposed and argued that it would highlight Baxter's statement, while Dobbins's counsel requested that an

to redaction or severance, because confessions and admissions that are powerfully incriminating present an especially great risk that limiting instructions will not be followed at potentially great prejudice to the non-confessing co-defendant." *Brisbon*, 957 A.2d at 954 (internal quotation and citations omitted). We repeat that caution here.

This, however, is the unusual case where we can conclude that the non-confessing co-defendant was not prejudiced by the admission of a co-defendant's unredacted inculpating confession in a joint trial. There was overwhelming evidence presented by eyewitnesses who knew Dobbins and directly implicated him in the murder.[13] The government's key witness, Hawkins, had a front-row seat from which he viewed the attack from his apartment window and gave a play-by-play account of Muldrow's murder, starting from the time when Muldrow was initially being beaten, and culminating with the sodomy that marked the last minutes of Muldrow's life. Hawkins testified that he saw Dobbins "wildly punching and kicking" Muldrow. Unlike other witnesses, Hawkins was not impeached for drug or alcohol use on the night of Muldrow's murder. Hawkins's testimony was corroborated by Hankins and Williamson. In addition, the jury's verdict suggests that in this case the jury followed the trial court's repeated instruc-

tions not to consider Baxter's statement in determining Dobbins's guilt. If the jury had accepted Baxter's statement, and used it improperly against the co-defendants, the jury would have come to the conclusion that Dobbins, by using the vacuum cleaner as a weapon (as Baxter said in the videotaped statement), was guilty of an armed attack on Muldrow, and that Matthew Ingram (who Baxter claimed in his statement was the person who shoved a pole into Muldrow's rectum) was guilty of sexual assault. Given that Dobbins was convicted only of *unarmed* second-degree murder—amply supported by Hawkins's testimony—and Matthew Ingram was acquitted of all charges, the jury's verdict clearly indicates that jurors were not swayed by Baxter's confession in considering the co-defendants' guilt, either because they followed the trial court's instructions, or simply because they disregarded Baxter's videotaped confession as unreliable, a self-serving attempt to shift blame to his co-defendants for the more gruesome aspects of the assault. We, therefore, conclude that the error in failing to sever the trials or redact Baxter's confession was harmless.[14]

## B. *Erroneous Aiding and Abetting Instruction.*

Ingram and Dobbins argue that their convictions should be reversed because the

---

additional cautionary instruction be given to the jury. Judge Greene, who was standing in for Judge Broderick, sent a note to the jury stating, "I remind you, as I believe Judge Broderick instructed you, that you may not consider this exhibit (the videotape of Baxter's statement) with regard to defendants Jamar Brown, Kevin Dobbins, Darion Ingram, Matthew Ingram, or Lamont Kenney."

**13.** We disagree with appellant's argument that our decision in *Brisbon*, supports his claim. In *Brisbon*, significant portions of Brisbon's unredacted lengthy videotaped confession directly identified his co-defendant,

Michael Wonson, as a principal and described their motivation and actions before, during and after the crime in great detail. *Id.* at 955–56. Moreover, we said, "[w]ithout Brisbon's confession, the government's evidence against Wonson was largely circumstantial ..." *Id.* at 956. This case is very different because the jury heard from several eyewitnesses who saw Dobbins participate in the attack on Muldrow.

**14.** Although Ingram's brief does not raise this issue on appeal, we come to the same conclusion with respect to Ingram as we do for Dobbins.

trial court gave the aiding and abetting instruction [15] we subsequently held was unconstitutional in *Wilson–Bey v. United States*, 903 A.2d 818, 822 (D.C.2006) (en banc). We disagree that the erroneous instruction warrants reversal in these appeals.

■■■■ The government argues that our review is limited to plain error because defense counsel never objected to the trial court's aiding and abetting instruction. Prior to the trial court's final jury instructions, the trial court directed the parties' attention to the then-standard aiding and abetting instruction, Criminal Jury Instructions for the District of Columbia, No. 4.02 (4th ed.1993) (the "Redbook"). Kenney's counsel asked for an additional explanation as to what made something "foreseeable" saying that "it's not something possible, it's something probable and natural ..." Dobbins's counsel also said that, "[t]he language I would suggest is getting to the point that the killing must be in the ordinary course of things the natural and probable consequence." Counsel did not object to the "natural and probable" consequences language of the aiding and abetting instruction, but requested that the trial court include a further explanation of the natural and probable consequence language as a supplemental instruction. Thus, we agree that the plain error standard governs our review. *See Carter v. United States*, 957 A.2d 9, 20 (D.C.2008) (noting that because appellant "did not object to the 'natural and probable consequences' instruction, we review his claim under the demanding plain error standard"). To obtain reversal of a conviction under plain error review, an appellant must show: (1) error; (2) that is plain or clear; and (3) that affects the defendant's substantial rights; if the appellant meets this burden, then the court may exercise its discretion to reverse if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Here, the first two aspects of plain error review, error that is obvious, are met. *See Pérez v. United States*, 968 A.2d 39, 93 (D.C. 2009). We, therefore, start our review by assessing whether the error implicated appellants' "substantial rights." *See Johnson v. United States*, 520 U.S. 461, 468–69, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

■■■■ To meet the third prong of plain error review, whether the error affected substantial rights, it is appellants' burden to show a "reasonable probability" of a different outcome if the jury had not been improperly instructed. *United States v. Dominguez Benitez*, 542 U.S. 74, 81–2, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (citing and adopting standard in *United States v. Bagley*, 473 U.S. 667, 681 n. 12, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Appellants argue that the prosecutor's statements at trial "very substantially increased the prejudice ... and increased the likelihood that the jury in this case convicted him of second-degree murder because of the erroneous aiding and abetting" instruction. We have no doubt that appellants were convicted of murder as aiders and abettors. The government's theory at trial was that appellants had

---

**15.** The trial court gave the following aiding and abetting instruction:

It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed or that he had intended to commit the particular crime committed by the principal offender.

An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates.

aided and abetted Baxter's murder of Muldrow. There is no question that the prosecutor emphasized this theory of criminal liability in closing argument, using the phrases "one for all, all for one," "in for a penny, in for a pound," and "collective and concerted action" in describing appellants' participation. But the prosecutor also focused on appellants' own actions, telling the jurors in rebuttal argument:

> It is enough that they [appellants] saw what was happening, that they saw the weapons being used, that they saw the behavior, *and they didn't just stand there, they didn't just approve it or condone it; they walked over, and at different points of time they entered, they joined, they participated.*

(emphasis added).

 In order to convict appellants of second-degree murder, the jury had to find that appellants had "a specific intent to kill, specific intent to inflict serious bodily harm, or wanton and willful disregard of an unreasonable human risk—also known as 'depraved heart' murder." *Pérez*, 968 A.2d at 102 (quoting *Comber v. United States*, 584 A.2d 26, 38–39 (D.C.1990) (en banc)). In assessing the impact of the erroneous instruction and the government's closing and rebuttal arguments on appellants' substantial rights, we consider the evidence presented to the jury and the verdict. In *Pérez*, for example, appellants had been convicted of first-degree murder on an aiding and abetting theory after the jury received a similarly erroneous instruction. 968 A.2d at 92–93. Although there was no evidence that any of the appellants had personally possessed knives or stabbed the victim, the evidence showed that they had chased, beaten and kicked the decedent and were part of the assaulting group when he was stabbed. *Id.* at

93–94. On plain error review, we vacated the first-degree murder convictions, but directed the trial court to enter convictions for second-degree murder as to each of the defendants because the evidence of their conduct as part of a group assault clearly met the *mens rea* element of malice sufficient for second-degree murder. *Id.* at 102–105. As to one defendant, we held that the requisite intent for second-degree murder could be inferred "through his joining in a group assault and viciously kicking [the decedent.]" *Id.* at 102; *see also Kitt v. United States*, 904 A.2d 348, 353 (D.C.2006) ("As a general rule, the requisite mens rea may be inferable from the facts and circumstances surrounding a murder . . .") (citation omitted).

Had Dobbins and Ingram attacked Muldrow only in the earlier stages of the attack, or if the nature of their own actions in the assault on Muldrow had not evidenced a wanton and willful disregard of an unreasonable risk of human life, their substantial rights may have been affected by the trial court's erroneous jury instructions.[16] *Cf. Perry v. United States*, 36 A.3d 799 (D.C.2011) (reversing convictions for aggravated assault because erroneous aiding and abetting instruction allowed appellants to be found liable "for negligently having begun a simple assault if it was 'natural and probable' that the melée would escalate to severe kicking by someone else, even if appellants did not themselves have the [requisite] intent"). However, the government produced evidence from eyewitnesses that Dobbins and Ingram actively and personally participated throughout the vicious beating and kicking that led to Muldrow's death. From this, the jury could infer, appellants acted, if not with a specific intent to kill, at the very

---

16. As discussed in the next section, this was Ingram's argument for requesting a new trial, which the trial court denied because the prof-
fered newly discovered evidence was not credible.

least with malice. The jury acquitted them of the sexual abuse count, and returned guilty verdicts only on the lesser-included offense of unarmed second-degree murder, making clear that the jury's verdict was based on appellants' individual "penny" and not for Baxter's "pound." On this evidence, appellants have not met their burden to show that there was a reasonable probability of a different outcome if the jury had not been improperly instructed.

### C. *Motion for New Trial–Newly Discovered Evidence.*

■■■ Before trial, appellant Darion Ingram had filed a motion to sever his trial from Matthew Ingram's, noting that Matthew could provide evidence that would exculpate Darion, but that his testimony would be unavailable while Matthew had a Fifth Amendment privilege in a joint trial. In the pretrial motion, counsel also pointed to Matthew's prior consistent recorded statement to police officers that, toward the beginning of the assault on Muldrow, someone had hit him with a glass bottle that shattered, with shards flying into Darion's eyes, which prompted Darion and Matthew to leave.

Darion's motion for a new trial was filed after the jury returned a verdict finding him guilty of second-degree murder and acquitting Matthew of all charges. The motion argued that because Matthew no longer had a Fifth Amendment privilege, his proffered exculpatory testimony constituted newly discovered evidence that entitled him to a new trial under Superior Court Criminal Rule 33. According to the proffer, Matthew would testify that, although Ingram was present at the beginning of the attack, he did not participate in the continued assault that killed Muldrow. The motion reminded the court that Matthew's testimony would be consistent with

the recorded pre-trial statement he gave to the police soon after Muldrow was killed.[17]

The trial court denied the motion, without a hearing, pointing to the absence of an affidavit from Matthew detailing what his testimony would be. In addition, the trial court did not believe that the jury would have credited Matthew's testimony over that of the witnesses presented at trial, noting that the jury did not appear persuaded by similar testimony from Darion's mother that he had come home after he had been injured by flying glass. Matthew later wrote a letter to the judge, and, at Darion's sentencing hearing, the trial court allowed Matthew to address the court at length. He explained that while Darion was at the scene of the murder, he "did not touch" Muldrow.

■■■ The trial court, on motion of a defendant, may grant a new trial if required in the "interests of justice." Super Ct.Crim. R. 33 (2011). To succeed on a motion for a new trial based on newly discovered evidence, "the movant has to show that: (1) the evidence is newly discovered; (2) the moving party was diligent in seeking to obtain the evidence; (3) the evidence is material to the issues involved and not merely cumulative or impeaching; and (4) it is of a nature that it would probably produce an acquittal." *Porter v. United States,* 826 A.2d 398, 414 (D.C. 2003) (quoting *Prophet v. United States,* 707 A.2d 775, 778 (D.C.1998); *Byers v. United States,* 649 A.2d 279, 287 (D.C. 1994)). Where the newly discovered evidence is testimony of a former co-defendant who remained silent at the earlier trial, "we have cautioned the trial court to scrutinize such evidence with great care ... [because] the co-defendant 'has little to fear in attempting to exculpate others

---

**17.** Matthew Ingram's statement to the police is not part of the record.

involved in the offense by assuming the entire blame.'" *Id.* (quoting *Prophet,* 707 A.2d at 778). "In evaluating the interests of justice, the trial court—sitting as a thirteenth juror—determines whether a fair trial requires that the [evidence] be made available to the jury." *Godfrey v. United States,* 454 A.2d 293, 299 (D.C.1983) (internal quotations and citations omitted). "In general, a trial court does not need to hold a hearing before ruling on a motion for [a] new trial." *Geddie v. United States,* 663 A.2d 531, 533–34 (D.C.1995). The trial judge has discretion to grant or deny a motion for a new trial, and our review is confined to determining whether there has been an abuse of that discretion. *See Porter,* 826 A.2d at 414.

In *Pérez,* we upheld denial of a motion for a new trial based on newly discovered evidence where the defendant failed to present an affidavit detailing the testimony of a new witness and the trial court concluded the motion was "too vague and conclusory to warrant serious consideration or a hearing." 968 A.2d at 86 n. 55. Here, there was no affidavit from Matthew, and although, as the trial court noted, "it is clear what the defense expects Matthew Ingram to say if he were called to testify, it is unknown what he would actually say if called by the defense." The trial court thus characterized Matthew's testimony as "speculat[ive]," and went on to say that:

> [Darion Ingram] was identified by witnesses Carlos Hawkins, Duane Hankins, Jacqueline Pollard, and Stephanie Lewis as having directly participated in the attack. Although one government witness, Tanya Mathis, testified that she never saw Darion Ingram involved in the assault during the part of the attack that she witnesse[d], clearly the jury credited the testimony of the other four witnesses who testified that Darion Ingram was an active participant in the beating. Matthew Ingram's anticipated

testimony would directly contradict with the testimony of several witnesses whom the jury obviously found credible.

At sentencing, where Matthew said Darion had "not touched" Muldrow, the trial court said the testimony of the eyewitnesses who testified at trial was "compelling."

Even if we assume that Matthew's preacquittal Fifth Amendment privilege rendered his testimony newly discovered for purposes of Rule 33, the decision of the trial court, from the perspective of a "thirteenth juror" who observed the trial firsthand, was "reasonable and supported by the evidence in the record." *Geddie,* 663 A.2d at 533–34. We cannot say the trial court abused discretion in denying the motion. *See Pérez,* 968 A.2d at 86 n. 55.

For the foregoing reasons, we affirm the judgments on appeal, but we remand the cases with instructions to vacate the duplicative second-degree murder convictions. *See Downing v. United States,* 929 A.2d 848, 864 (D.C.2007).

*So ordered.*