*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-16

TAVON BARBER, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 03/01/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CF1-11157-13)

(Hon. Russell F. Canan, Trial Judge)

(Submitted May 3, 2017                    Decided March 1, 2018)

*Matthew B. Kaplan* was on the brief for appellant.

*Channing D. Phillips*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman*, *Elizabeth H. Danello*, *Sharon Donovan*, *Lindsay Suttenberg*, and *Patricia A. Heffernan*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and PRYOR, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*:  This case asks us to decide what impact, if any, revelations of systematic concerns with the District of Columbia Department of Forensic Sciences' interpretations of DNA test results had on appellant Tavon Barber's trial, in which the government presented DNA evidence

to prove his involvement. Following a jury trial, appellant was convicted of numerous charges stemming from his participation in two burglaries and a sexual assault.[1] There was DNA evidence, as well as testimonial, fingerprint, and documentary evidence, linking appellant to these crimes. The District of Columbia Department of Forensic Sciences ("DFS") conducted DNA testing and analysis, and one of its forensic scientists testified to DFS's findings at appellant's trial. However, another DNA expert, Dr. Bruce Budowle, disagreed with some, but not all, of DFS's statistical interpretations of the DNA evidence found in appellant's case, and Dr. Budowle testified as to his own findings. Nevertheless, both DFS and Dr. Budowle came to the expert conclusion that appellant or his partner in crime, DeAundre Williams, were possible contributors to at least some of the DNA samples collected.

---

[1] Specifically, appellant was convicted of: (1) one count of first-degree burglary, *see* D.C. Code § 22-801 (a) (2012 Repl.); (2) one count of first-degree burglary while armed, *see* D.C. Code §§ 22-801 (a), -4502 (2012 Repl.); (3) two counts of first-degree theft, *see* D.C. Code §§ 22-3211, -3212 (a) (2012 Repl.); (4) one count of second-degree theft, *see* D.C. Code §§ 22-3211, 3212 (b) (2012 Repl.); (5) one count of unlawful possession of a firearm during a crime of violence, *see* D.C. Code § 22-4503 (a)(1), (b)(2) (2012 Repl.); (6) three counts of assault with a dangerous weapon ("ADW"), *see* D.C. Code § 22-402 (2012 Repl.); (7) one count of assault with intent to commit first-degree sexual abuse while armed (with aggravating circumstances), *see* D.C. Code §§ 22-401, -3002 (a)(1), -4502, -3020 (a)(6) (2012 Repl.); (8) three counts of third-degree sexual abuse while armed (with aggravating circumstances), *see* D.C. Code §§ 22-3004 (1), -4502, -3020 (a)(6) (2012 Repl.); and (9) eight counts of possession of a firearm during a crime of violence ("PFCV"), *see* D.C. Code § 22-4504 (b) (2012 Repl.).

Post-trial but pre-sentencing, the government disclosed to appellant that a panel of experts, which included Dr. Budowle, convened by the United States Attorney's Office ("USAO"), had identified certain, systematic issues with DFS's interpretations of DNA evidence, based on Dr. Budowle's work in appellant's case. Based on this disclosure, appellant filed a motion for a new trial, which the trial court denied. *See* Super. Ct. Crim. R. 33 ("Rule 33").

On appeal, appellant challenges the trial court's decision to deny his motion for a new trial. He claims that DFS's systemic problems undermined the reliability of the DNA evidence presented at his trial and, thus, confidence in the verdict. Appellant also argues merger; he claims that his three third-degree sexual abuse convictions for acts committed against one victim merge into one count, and that his eight possession of a firearm during a crime of violence ("PFCV") convictions also merge into just one count.

We affirm the trial court's denial of appellant's motion for a new trial. We conclude that the government's post-trial disclosure regarding systematic concerns with DFS's interpretations of DNA evidence would not have changed the outcome of appellant's case. The jury heard from Dr. Budowle as to his concerns with DFS's DNA analysis, as well as his own calculations and interpretations of the

DNA evidence. Further, the DNA evidence constituted a relatively minor portion of the government's evidence in the totality. We also affirm on the issue of merger. Appellant's three third-degree sexual abuse convictions and his eight PFCV convictions do not merge because each count is predicated on a distinct act.

## I.    Factual Background

The government's evidence at trial proved to the jury that appellant, with the help of another individual, DeAundre "Dre" Williams,[2] committed two home invasion burglaries in Northeast Washington, D.C. between June 4 and June 5, 2013.[3] The government also proved that, during the course of the second home invasion, appellant sexually assaulted the female occupant.

---

[2] Mr. Williams was not tried with appellant.

[3] The government also charged appellant with committing a third home invasion burglary, but the jury acquitted appellant of that count, so we do not reference the facts or evidence relating to that charge in our opinion.

### A. 1105 Sixth Street, Northeast

The first incident occurred at a townhouse located at 1105 Sixth Street, Northeast. At around 11:00 a.m. on June 4, one of its residents, Ameya Bhende,[4] discovered that his laptop and book bag, along with his roommate's laptop, were missing. Mr. Bhende also noticed that the keys to his vehicle, a gray Mitsubishi Galant, were missing, and that the vehicle itself, which Mr. Bhende had parked "just around the corner," was gone. Inspecting the house, Mr. Bhende detected that one of the kitchen windows, along with the window screen, was open, and that the front door was already unlocked, which Mr. Bhende thought was "a little unusual." The Metropolitan Police Department ("MPD") subsequently recovered Mr. Bhende's vehicle around the 2500 block of Second Street, Northeast, near the site of the second burglary, and towed the vehicle to a consolidated forensics laboratory.

---

[4] The townhouse was occupied and shared by Sam Warren, David O'Brien, Christa Snyder, and Mr. Bhende.

The police recovered appellant's fingerprint from the interior bottom frame of the open kitchen window.[5] From Mr. Bhende's vehicle, the police recovered appellant's fingerprint from the exterior front passenger door window frame and Mr. Williams's fingerprint from the exterior front passenger door window. The police also recovered DNA samples from inside Mr. Bhende's vehicle that were consistent with appellant's and Mr. Williams's DNA profiles. Specifically, expert witnesses DFS DNA Analyst Krystyna Hopkinson[6] and Dr. Budowle[7] agreed[8] that neither appellant nor Mr. Williams could be excluded as possible contributors to DNA found on a cigarette butt recovered from the vehicle and from DNA recovered from the steering wheel. Additionally, they agreed that Mr. Williams's

---

[5] DFS Latent Fingerprint Specialist Diane Glover testified to her findings based on the fingerprints collected. DFS's fingerprint analysis protocols are not in question.

[6] Ms. Hopkinson has a master's in forensic science with a concentration in forensic biology. She completed the FBI's serology program, and DNA training at Marshall University.

[7] Dr. Budowle is the Executive Director of the Institute of Applied Genetics at the University of North Texas Health Science Center. He previously had been employed as a senior scientist at the FBI for twenty-six years developing methods for DNA testing. He was also the Chair of the Scientific Working Group on DNA Analysis Method and of the International Society of Forensic Genetics.

[8] Because DFS's interpretations of DNA evidence are at issue in this case, out of an abundance of caution, we recite only the DNA conclusions that both DFS and Dr. Budowle agreed upon. Dr. Budowle's expertise or methodology is not in question.

known DNA profile matched the major male contributor samples recovered from the interior driver's door handle and from the interior passenger door handle.

### B. 2432 Second Street, Northeast

The second incident occurred at a house located at 2432 Second Street, Northeast. The upstairs bedroom was shared by husband, J.B., and wife, E.H.,[9] while the basement bedroom was occupied by their friend, Allison Schneider. During the early-morning hours on June 5, 2013, Mr. B. and Ms. H. were sleeping in their bedroom when they were suddenly woken up by two masked men, one pointing a handgun directly at them and one holding a knife. The government's theory at trial was that the gunman was appellant, while the man with the knife was Mr. Williams. Mr. B. described the gunman as being roughly six foot, "slender build," and "medium to dark complexion," which approximated appellant's physique. Mr. B. also noted in court that appellant looked "[v]ery, very similar" to the gunman based on his height, "the long arms, his torso, just the structure of his body."

---

[9] In the interests of their privacy, we have redacted the victims' names.

Upon waking up Mr. B. and Ms. H., the gunman repeatedly yelled, "[W]here's the money at, where's the money at" and "[S]hut the f**k up," and ordered them to "[p]ut [their] head[s] underneath [their] pillow[s]." Both Mr. B. and Ms. H. complied by rolling onto their stomachs and putting their faces on their pillows. Mr. B. also informed the men that his wallet was in the adjacent office. The gunman thereafter directed the man with the knife to, "Get it all, let's get it all," and, in response, the man with the knife exited the bedroom, went into the office, and then moved downstairs, ostensibly to find other things of value to steal.

Meanwhile, the gunman, now alone with Mr. B. and Ms. H., approached Ms. H.'s side of the bed and lifted off the duvet covers, thereby exposing Ms. H.'s nightgown and bare bottom. Appellant then "slapped [Ms. H.'s] a**," while repeatedly saying that, "He really liked this. This is what he wanted." When Mr. B. became unnerved by the gunman's comments and turned to look at him, the gunman pistol whipped Mr. B. in the head. Turning his sights back on Ms. H., the gunman threatened that he was "going to be, you know, all up in this." He forced Ms. H. to roll onto her back and stroked the front of her body, including her breasts, stomach, and upper thigh. Ms. H. instinctively flipped back onto her stomach and recalled that the gunman then "took the barrel of the gun and sort of moved it in between [her] legs and in between [her] buttocks." The gun was so

high up Ms. H.'s thighs that it was "very, very close" to the outside of her vulva. The gunman next grabbed Ms. H.'s "hips and threw her on to her knees," and pulled her towards his pelvic region. He also pistol whipped Mr. B. again. Having positioned Ms. H., the gunman attempted to unzip his pants. To prevent his wife from being raped and seeing an opening, Mr. B. lunged at the gunman and made an effort to grab the handgun.

A struggle between the gunman and Mr. B. ensued. As the two men fought, Ms. H. "raced out of the room" and "ran down the steps," while yelling for Ms. Schneider to call 911. Meanwhile, during the ensuing struggle, the gunman started yelling for his cohort to come help him. Mr. B. heard the gunman say "Jay, Jay," which sounds like Mr. Williams's nickname, "Dre." Both intruders then started to beat Mr. B., and as they attempted to escape the residence, the gunman fired one round at Mr. B., but missed. The intruders stole Mr. B.'s wallet, containing fifty dollars and his debit and credit cards, a MacBook Pro computer, a Dell computer, two iPhones, and a backpack. The police subsequently recovered a clear imprint of appellant's left palm on the hand railing inside the residence. Dr. Budowle further testified that neither Mr. B. nor Mr. Williams could be excluded from a knife recovered from the scene, and that Mr. Williams also could not be excluded from a shirt recovered from the scene.

### C. Appellant's Confession

The government's evidence also included key testimony from Jamir Graham, a friend of appellant and Mr. Williams. Mr. Graham testified that in the early-morning hours of June 5, he was sleeping at home when he was woken up by Mr. Williams standing near him while holding two iPhones and an unfamiliar wallet. Appellant arrived shortly after and appeared "[w]orried" and "eager to leave." Then, a few days later, Mr. Graham ran into appellant again, whereupon appellant confessed to his involvement in the burglary and sexual assault at 2432 Second Street, Northeast. Appellant told Mr. Graham specific details of the crime. He told Mr. Graham that he and Mr. Williams went up the steps of the house, and that he yelled at the couple, "[W]here's the money at?" Appellant also admitted to "pull[ing] the covers off the lady," "[s]mack[ing] the lady on her a**," and putting the gun to her "p**sy." He said that the "husband charged at him," and that he "f**ked up" by yelling "Dre['s] name" for help. Lastly, he admitted to firing the gun at the husband and thought that he had hit him before fleeing the scene. Based on the above evidence, in addition to other evidence,[10] the jury convicted appellant

---

[10] For example, there was documentary evidence showing that appellant and his cohorts were in possession of Mr. B.'s credit cards. Specifically, Mr. Graham admitted to using or attempting to use the credit and debit cards found inside the

(Continued . . .)

for crimes related to his involvement in the 1105 Sixth Street and 2432 Second Street home invasions.

## II. Discussion

### A. *Motion for a New Trial Based on Newly Discovered Evidence*

Prior to trial, the government disclosed to appellant that it had asked Dr. Budowle to review DFS's DNA test results in this case, and "to recalculate all of the statistics related to DNA testing done on items collected from 2432 [Second] Street, Northeast, and the car stolen from 1105 [Sixth] Street, Northeast."[11] The

---

(. . . Continued)

unfamiliar wallet that Mr. Williams had been carrying. Business records confirmed that Mr. B.'s stolen credit and debit cards were the cards that Mr. Graham was trying to use, based on the transaction history.

[11] The government initially notified appellant by letter on May 23, 2014, that Dr. Budowle had been called to review DFS's analysis of the DNA recovered from the cigarette butt only. On September 30, 2014, however, the government informed appellant that it had asked Dr. Budowle to review all of DFS's DNA results. On October 5, 2014, the government informed appellant that Dr. Budowle had recalculated the statistics for all of the DNA testing completed. On October 12, 2014, the government further informed appellant that Dr. Budowle disagreed with Ms. Hopkinson's exclusion of appellant from being a contributor to one of the steering wheel and one of the dashboard samples. The government indicated that it would not elicit this favorable evidence to the jury unless elicited by the defense.

gist of Dr. Budowle's findings was that, while he agreed with DFS's allele decisions, and generally the "inclusions and exclusions" made by DFS, he disagreed with a few of the statistical calculations performed by DFS under the combined probability of inclusion ("CPI")[12] and the random match probability ("RMP")[13] methods. An "allele" is a "genetic variation" that is inherited from a person's mother and father. Alleles produce distinct traits that are passed from parent to offspring. An "inclusion" means the sample matches the reference sample "taken directly from an individual in which the identity of that person is known." Conversely, an "exclusion" means the sample does not match.

Subsequently at trial, DFS DNA Analyst Hopkinson first explained to the jury how DNA testing is conducted and the specific DNA testing that she performed in this case. Ms. Hopkinson then testified to her conclusions for each piece of DNA evidence recovered by the police. She testified to the number of possible contributors for each DNA sample recovered, and whether the alleles of

---

[12] "The Combined Probability of Inclusion (aka the CPI) is a simplified statistical approach that provides an estimate of the portion of the population that may be part contributors to a DNA mixture."

[13] Random Match Probability "is a statistic applied to single source samples. In many such instances the major contributor profile can be treated as a single source profile for statistical purposes."

appellant, Mr. Williams, and/or the victims could be included or excluded, or whether no conclusions could be drawn, for each sample. Notably, Ms. Hopkinson did not reveal the statistical calculations underlying her inclusion and exclusion decisions.

Dr. Budowle testified to his review of Ms. Hopkinson's DNA testing in this case; he agreed with Ms. Hopkinson's determinations of whether the alleles match or did not match the suspects or victims, and generally agreed with her inclusions and exclusions as well. However, in a few instances, Dr. Budowle "felt that [DFS] over extended themselves and used some markers for statistics that [he] thought they shouldn't if they were following the protocol." Dr. Budowle then testified to his own statistical calculations for each DNA sample recovered in this case.[14]

---

[14] For example, he used the "likelihood ratio" method on the cigarette butt sample. He calculated that it was "18 million times more likely to see that DNA mixture if it came from [appellant and Mr. Williams] than if it came from two unrelated individuals in the African American population." Dr. Budowle used the CPI method on the steering wheel sample and explained that "116 to about 121 individuals" would have DNA consistent with the mixture containing appellant's, Mr. Williams's, and Mr. Bhende's DNA. Dr. Budowle used the RMP method on the interior driver's door handle sample containing a single source profile and concluded that Mr. Williams's profile matched the sample to a statistical certainty.

Following appellant's trial, but prior to sentencing, the government informed appellant by letter dated March 10, 2015, that subsequent to Dr. Budowle's work in this case, DFS initiated an internal investigation regarding its protocols for calculating DNA mixtures and issued two reports on November 19, 2014. When the USAO learned of the issue, it convened a panel of three experts, which included Dr. Budowle, to review DFS's DNA analysis in other cases.[15] The panel's Final Report[16] dated April 22, 2015, identified five primary systematic concerns with DFS's interpretations of forensic DNA mixtures,[17] and made recommendations on how to remedy those concerns.

---

[15] The other experts were Lisa Brewer, the former Technical Lead for the District of Columbia's DNA Laboratory and Dr. Frederick Bieber, a Harvard statistician and geneticist.

[16] BRUCE BUDOWLE, FREDERICK R. BIEBER, FINAL REPORT ON REVIEW OF MIXTURE INTERPRETATION IN SELECTED CASEWORK OF THE DNA SECTION OF THE FORENSIC SCIENCE LABORATORY DIVISION (FSL), DEPARTMENT OF FORENSIC SCIENCES (DFS), DISTRICT OF COLUMBIA (Apr. 22, 2015).

[17] Specifically, the panel identified the following problems:

    a) inappropriate use of the combined probability of inclusion statistical approach (CPI) in mixtures by inclusion of loci where allele drop out was highly probable;

    b) inappropriate use of the CPI in mixtures by including individuals whose known alleles were not present, at those loci, in the evidence samples;

(Continued . . .)

Based on the government's disclosure of its investigation and the Final Report, on September 1, 2015, appellant filed a Rule 33 motion for a new trial. Appellant argued in the motion that the government "relied heavily on DNA evidence in convicting" him, but that his case was the "first of over thirty (30) cases[18] that [brought] to light serious problems with [DFS's] handling of DNA sample[s] submitted for analysis." Appellant further asserted that the panel's recommendations "unequivocally demonstrate the unreliability of DFS testing and invalidates *the entire testing process*," and that he was entitled to a new trial. (emphasis added).

The government opposed the motion and countered that the DNA testing conducted in this case was reliable and accurate, and that the only point of concern was with regard to DFS's "computation of statistics that resulted in DFS

_____

(. . . Continued)

    c) inappropriate calculation of two separate CPIs for the same forensic DNA mixture profile;

    d) not using established stochastic thresholds to assess potential allele drop out; and

    e) inconsistencies and deficiencies in the technical review process of the DNA analysis pipeline.

*Id.* at 2.

[18] The government admits that it had identified forty-eight cases with statistical calculation issues.

overstating the rarity of certain mixture profiles." The government attached Dr. Budowle's affidavit to the opposition, in which Dr. Budowle affirmed that, while he had concerns with the statistical analysis performed by DFS, the actual "DNA typing *results* [i.e., DFS's handling of the DNA samples, and the chemistry and bench work] were reliable, based on all the control samples that were run," and that "[i]f the results were not reliable, [he] would not have provided any statistical calculations." The government also asserted that evidence pertaining to DFS's systematic issues would not have led to an acquittal because the evidence against appellant was overwhelming, and that if appellant had "cross-examined Ms. Hopkinson and Dr. Budowle on the systematic issues at DFS, the jury would have learned from Dr. Budowle — the most knowledgeable, experienced and published DNA scientist in the world . . . — that these issues did not impact the DNA evidence presented to the jury in this case."

The trial court denied appellant's motion for a new trial after hearing arguments on the motion. The court noted that there were no concerns with the actual DNA testing in this case, and that the systematic concerns that were later identified with DFS, had they been raised at appellant's trial, would have gone to the "impeachment of Ms. Hopkinson regarding [her] *interpretation* of [the] mixture evidence." (emphasis added). The court further observed that the DNA

evidence in this case, although "not unimportant," was not the "key evidence." The trial court concluded that key evidence in this case were the fingerprints found at both burglary scenes and also appellant's confession to Mr. Graham.

On appeal, appellant argues that the trial court erred by refusing to grant his motion for a new trial. He again asserts that the DNA evidence was "critical to the government's case," and that disclosure of DFS's systematic concerns would have led to his acquittal.[19] We affirm the trial court's decision to deny appellant's motion for a new trial.

Pursuant to Rule 33, the trial court may grant a motion for a new trial "if required in the 'interests of justice.'" *Ingram v. United States*, 40 A.3d 887, 901 (D.C. 2012) (quoting Super. Ct. Crim. R. 33). A Rule 33 motion based upon a claim of newly discovered evidence requires appellant to show that: "(1) the evidence is newly discovered; (2) the moving party was diligent in seeking to obtain the evidence; (3) the evidence is material to the issues involved and not

---

[19] In appellant's initial Rule 33 motion, he also alleged that there were labeling errors documented at DFS, and that DFS's testing did not meet general scientific acceptance under the test enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Appellant makes no such arguments in his appellate brief; therefore, any such arguments are forfeited. *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993).

merely cumulative or impeaching; and (4) it is of a nature that it would probably produce an acquittal." *Porter v. United States*, 826 A.2d 398, 414 (D.C. 2003). "In evaluating the interest of justice, the trial court — sitting as a thirteenth juror . . . — determines whether a fair trial requires that the evidence be made available to the jury." *Godfrey v. United States*, 454 A.2d 293, 299 (D.C. 1982) (citation, internal quotation marks, and brackets omitted). The "trial court does not need to hold a hearing before ruling on a motion for a new trial," and our review on appeal is "confined to determining whether there has been an abuse of [] discretion." *Ingram*, *supra*, 40 A.3d at 902 (citation and internal quotation marks omitted).

In this case, there is no dispute that the systematic concerns with DFS's interpretations of DNA evidence constitute newly discovered evidence, and that appellant would not have discovered this information regardless of diligence. Instead, the parties argue over whether (a) this new evidence can be considered material and "not merely cumulative or impeaching" and (b) whether the evidence, had it been discovered, would "probably produce an acquittal." *Porter*, *supra*, 826 A.2d at 414.

First, we conclude that the concerns with DFS were not material to appellant's case. The information that the government disclosed following trial

regarding the systematic concerns with DFS's DNA statistical calculations were similar to concerns that were present during appellant's trial, and which were known to appellant prior to trial. Concerns with DFS's statistical analyses of DNA evidence discovered in other cases do not bring up any new concerns with its analysis of the DNA conducted in appellant's case because the government had called Dr. Budowle to expressly recalculate the statistics for all of the DNA samples recovered in this case prior to trial. At trial, he testified to his concerns with DFS's calculations, and provided the jury with his own findings and the correct calculations, which appellant does not dispute. In fact, Ms. Hopkinson of DFS never revealed her statistical calculations at trial, so the jury did not hear about any calculations that Dr. Budowle would have concerns about.

Further, none of the evidence at trial, nor the post-trial disclosures by the government, cast doubt on DFS's actual *testing* of the DNA samples in this case or any other case sampled. Dr. Budowle's affidavit explained that, if he had concerns with the reliability of the DNA testing performed by DFS, he would not have even "provided any statistical calculations." Accordingly, the fact that there were problems with DFS's statistical calculations for DNA found in other cases, if revealed at trial, would, at best, go toward further impeachment of Ms. Hopkinson's testimony. But our case law is clear that new "[e]vidence which is

merely impeaching or cumulative . . . cannot be the basis of a new trial based on newly discovered evidence." *Huggins v. United States*, 333 A.2d 385, 387 (D.C. 1975).

Second, we further conclude that this new evidence would not have "probably produce[d] an acquittal." *Porter*, *supra*, 826 A.2d at 414. The evidence of appellant's involvement in the second home invasion on Second Street was overwhelming. DNA evidence played little role in proving this part of the government's case, as it consisted solely of Dr. Budowle testifying that Mr. Williams could not be excluded as a contributor to the knife and shirt recovered from the scene. Mr. B. testified that appellant looked "very, very similar" to the masked gunman who attacked him at close range and sexually assaulted his wife. He also recalled appellant yell "Jay," which sounds like Mr. Williams's nickname, "Dre." A very clear handprint belonging to appellant was found on the hand railing inside of the home. Further, Mr. Graham testified in great detail to appellant's confession that he had committed the home invasion and sexual assault at 2432 Second Street, Northeast. There were also business records indicating that first, Mr. Williams, and later, Mr. Graham, were in possession of Mr. B.'s debit and credit cards.

Other forensic evidence demonstrating appellant's involvement in the first home invasion on Sixth Street was also significant. Specifically, his and Mr. Williams's fingerprints were recovered from both inside the residence and on Mr. Bhende's vehicle. Moreover, even excluding Ms. Hopkinson's testimony in its totality, Dr. Budowle's DNA analysis, alone, placed both appellant and Mr. Williams inside of Mr. Bhende's stolen vehicle.

Accordingly, the trial court did not abuse its discretion in denying appellant's motion for a new trial.

### B. Merger

"The Double Jeopardy Clause of the Fifth Amendment prohibits a second prosecution for a single crime, and it protects the defendant against multiple punishments for the same offense." *Ellison v. United States*, 919 A.2d 612, 614 (D.C. 2007). "Where a defendant has been convicted of two violations of the same statute, [on de novo review,] we have employed a 'fact-based analysis' to determine whether 'separate criminal acts have occurred.'" *Id.* at 615 (citation omitted). "For purposes of this fact-based merger analysis, criminal acts are considered separate when there is an appreciable length of time between the acts

that constitute the two offenses, *or* when a subsequent criminal act was not the result of the original impulse, but a fresh one." *Sanchez-Rengifo v. United States*, 815 A.2d 351, 354-55 (D.C. 2002) (emphasis added) (citations and internal quotation marks omitted).

Appellant's three third-degree sexual abuse convictions are based on the following acts: (1) slapping Ms. H. on the buttocks; (2) touching her breast with his hand; and (3) touching her inner thigh and buttocks with his firearm. Appellant argues that these three convictions should merge because they constitute a single continuous act of sexual abuse over a brief period of time, rather than three distinct acts in which multiple crimes may be imposed. We have said that some crimes "by their very nature, tend to be committed in a single continuous episode rather than a series of individually chargeable acts." *Id.* at 356. Such crimes include rapes, assaults, and accordingly sexual abuses, committed against one individual. *Id.* For instance, the government cannot charge a defendant with several counts of assault just because the defendant struck "several blows" against one victim. *Id.* Likewise, "repeated acts of forced sexual intercourse, if committed in a single course of conduct will not be converted into separate rapes." *Id.* In situations like this, the key consideration in determining whether multiple crimes for acts committed against one victim merge is whether "the defendant can be said to have

realized that he [or she] has come to a *fork in the road*, and [still] decides to invade a different interest[.]" *Ellison*, *supra*, 919 A.2d at 615 (emphasis added) (citations omitted). "[A]n interval may be quite brief and still satisfy the 'appreciable period of time' factor." *Id.* (citation omitted).

For example, in *Ellison*, the defendant was charged with two counts of misdemeanor sexual abuse, one based on his vaginal intercourse with the minor victim, and the second based on his attempted anal intercourse of the same victim a short time later. *Id.* at 613. On appeal, he argued merger and this court, in applying the "fork-in-the-road" test determined that the two actions constituted two separate crimes. *Id.* at 615. Specifically, we concluded that, after having vaginal intercourse with the victim, the defendant "surely [made] a conscious and deliberate" decision to attempt to penetrate the victim's anus in order to "seek a *new* and *different* kind of sexual gratification." *Id.* at 616 (emphasis added). Likewise, in *Jenkins v. United States*, we concluded that the defendant's actions in first vaginally penetrating the victim and then digitally penetrating her constituted two separate crimes because he "reached a fork in the road . . . [and] [a]cting on a different *sexual urge*, [the defendant] initiated a different sexual act and invaded a different protected interest." 980 A.2d 421, 426 (D.C. 2009) (emphasis added). On the other hand, in *Cullen v. United States*, we held that the defendant could not

be found guilty of two counts of misdemeanor sexual abuse for making contact with the complainant's inner thigh and then breast with his mouth in rapid succession. 886 A.2d 870, 872 (D.C. 2005). We were not convinced that the defendant "reached a new fork in the road or acted in response to a fresh impulse" in doing so. *Id.* at 873.

In cases of sexual abuse such as here, the critical consideration in determining questions of merger is whether the defendant sought a "new and different kind of sexual gratification," *Ellison*, *supra*, 919 A.2d at 616, with each act committed against the victim, such that we are convinced that the defendant was acting "in response to a fresh impulse," *Cullen*, *supra*, 886 A.2d at 873, each time.

Here, we conclude that appellant's actions in first slapping Ms. H.'s bottom and then flipping her over to touch her breast do not merge because his actions demonstrate an attempt to satisfy a different kind of sexual gratification and a fresh impulse. In *Ellison*, we noted that merger was appropriate in *Cullen* in part because the defendant did not order the victim to "change her physical position." 919 A.2d at 617. The situation here, however, demonstrates that appellant forced Ms. H. to switch positions in order to touch the front of her body. Importantly,

there was also an interruption between the two assaultive acts: appellant turned to Mr. B. and struck him in the face with his gun before turning back to Ms. H. and touching her breast. When appellant turned back to Ms. H. after striking Mr. B., he was satisfying a "fresh impulse" to sexually assault her in a different way. We conclude that, on these facts, appellant's actions demonstrate an intention on his part to satisfy a different sexual impulse and is distinguishable from *Cullen* where the defendant, in rapid succession, made contact with two points on the victim's front side of her body.

We further conclude that appellant's subsequent use of a handgun in touching Ms. H.'s thighs and buttocks constitutes a fresh impulse that makes merger inappropriate. Use of a handgun to threaten another's private area contemplates a termination of appellant's original intent to engage in mere physical contact with Ms. H.'s body with his hand, and the creation of a fresh impulse to threaten Ms. H. with a dangerous weapon in order to satisfy a different kind of sexual gratification. It "surely" was a "conscious and deliberate" decision on the part of appellant to stop using his hand and to instead use the handgun to touch Ms. H.'s bottom and inner thigh. *Ellison*, *supra*, 919 A.2d at 616. Moreover, the third-degree sexual abuse statute criminalizes both the use of "force" against another and through "threatening or placing that other person in reasonable fear that any person

will be subject to death, bodily injury, or kidnapping." D.C. Code § 22-3004 (1)-(2). Appellant's use of his hand to touch Ms. H., and then a handgun to threaten Ms. H., arguably denotes the legislature's attempt to distinguish different counts of third-degree sexual abuse based on differences in the nature and character of the acts. *See Sanchez-Rengifo*, *supra*, 815 A.2d at 357.

We quickly dispose of appellant's merger claim as to his eight counts of PFCV. As a general rule, "where two predicate armed offenses do not merge, a defendant may be convicted of separate counts of PFCV relating to each offense; that is, as to each crime of violence or dangerous crime." *Stevenson v. United States*, 760 A.2d 1034, 1035 (D.C. 2000) (citation and internal quotation marks omitted). We apply the same "fork-in-the-road" and "fresh impulse" test in determining whether there are distinct acts underlying each PFCV conviction. *Id.* at 1037-38.

Appellant's eight PFCV convictions in this case stem from the following acts: (1) burglary; (2) ADW (pointing the handgun at the couple); (3) assault with intent to commit first-degree sexual abuse; (4), (5), (6) three counts of third-degree sexual abuse; (7) ADW (pistol whipping Mr. B.); and (8) ADW (shooting at Mr. B.). Setting aside the three counts of third-degree sexual abuse, we conclude the

other five counts of PFCV are all predicated on distinct acts. Each time, appellant was at a "fork in the road" and had an opportunity to reconsider his actions from the moment when he entered into the house with a gun, to pointing the handgun at Mr. B. and Ms. H., to attempting to rape Ms. H.,[20] to pistol whipping Mr. B., and lastly to shooting at Mr. B. as he attempted to escape the residence. *See Spain v. United States*, 665 A.2d 658, 661 (D.C. 1995). As for the three PFCV counts predicated on the three third-degree sexual abuse convictions, we held above that the three counts of third-degree sexual abuse do not merge based on the "fork-in-the-road" test. Accordingly, the three predicate PFCV counts also do not merge.

### III.    Conclusion

Based on the abovementioned reasons, the judgment of conviction by the Superior Court is

*Affirmed.*

---

[20]    The third-degree sexual abuse counts do not merge with the assault with intent to commit first-degree sexual abuse because the former pertain to appellant's non-consensual touching of Ms. H., while the latter pertains to his attempt to rape her.