Alfred L. SWINSON, Appellant,

v.

UNITED STATES, Appellee.

Alexander BARNES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 83–525, 83–684.

District of Columbia Court of Appeals.

Argued Sept. 26, 1984.

Decided Nov. 1, 1984.

Max C. Dorian, Washington, D.C., appointed by this court, for appellant Swinson. Richard S. Greenlee, Public Defender Service, Washington, D.C., with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for appellant Barnes.

John P. Dominguez, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Keith A. O'Donnell and Michael Farrell, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, NEWMAN and BELSON, Associate Judges.

MACK, Associate Judge:

Appellants Alfred L. Swinson and Alexander Barnes were charged with second-degree burglary of the Stadium Armory Metropolitan Transit station, D.C.Code § 22–1801(b) (1981), breaking and entering a vending machine, D.C.Code § 22–3427 (1981), and destruction of property, D.C. Code § 22–403 (1981). Barnes was also charged with second-degree burglary of the Rhode Island Avenue Metropolitan Transit station, breaking and entering a vending machine, destruction of property, and grand larceny, D.C.Code § 22–2201 (1981). On March 17, 1983, a jury returned a verdict of guilty as to both appellants on all counts.

On appeal, both Barnes and Swinson contend that the verdicts of second-degree burglary must be reversed because a metro station does not fall within any of the categories of buildings listed in the D.C.Code burglary statute. Both appellants also contend that the evidence was insufficient to sustain their convictions. Appellant Swinson further argues that the trial court's admission of certain physical evidence was error. For the reasons set forth below, both convictions will be affirmed.

*Facts*

At 5:00 a.m. on October 3, 1981, Metropolitan Police Officer Lawana Pressley responded to a silent burglar alarm in the Rhode Island Avenue Metropolitan Transit station, an "outdoor" metro station with pedestrian entrances secured by steel gates locked with chains and bolts. On arrival, she found that a farecard machine inside the station had been pried open, its locking "T-bar" device broken, with its coin hoppers missing. The hoppers were subsequently discovered outside of the station, and fingerprints removed from them were found to match those of appellant Barnes.

On October 6, 1981, Officer Pressley was again on patrol. Arriving at the Stadium Armory metro station in response to an alarm, she observed a man standing 25 feet from her squad car under the well-lit entrance to the station's pedestrian escalator. This individual was wearing a tan hat and blue denim jacket. Three other individuals then emerged from the escalator, dropping a hatchet and a sledge hammer, both subsequently recovered, in front of the escalator. All ran directly in front of Officer Pressley's squad car, and she testified that she had a good opportunity to observe them under her car's headlights. Officer Pressley pursued the suspects until they separated; she then pursued one until he ran down an alley and escaped. A second officer, Timothy Gronau, responding to Officer Pressley's flash lookout, observed appellant Barnes a few blocks away from the Stadium Armory station; Barnes matched the broadcast description and was subdued despite his attempt to escape. Officer Pressley identified Barnes at the scene as one of the men she had seen emerging from the metro station. Pressley then returned to the location at which she had last seen one of the suspects, where she ob-

served a pickup truck emerging from an alley. She recognized the driver of the truck, appellant Swinson, as the individual she had seen standing at the top of the metro station escalator. On the front seat of the truck were a tan hat and a denim jacket, matching the clothes worn by the escalator lookout. In the jacket's pocket were a stack of empty coin wrappers. Pressley also recovered a hatchet from the bed of the pickup truck.

.The farecard machines in the Stadium Armory and Rhode Island stations were broken into in similar ways: a locksmith mechanic testified at trial that the locking mechanisms in both were broken with an axe, a hatchet, or a chisel, which had been pounded into the machine with a hard blunt object, like a sledge hammer.

### Barnes' Defense

Barnes denied participating in the burglary of the Rhode Island Avenue metro station on October 3, 1981. With respect to the October 6, 1981 burglary of the Stadium Armory station, Barnes presented an alibi defense. Ulysses Hosten testified that he and Barnes had been at a nightclub, "Breezes," until 4:00 a.m. on the night of the burglary. In rebuttal, the owner of the nightclub testified that the club was closed on the morning of October 6th.

### Swinson's Defense

Swinson's wife testified that she lives three blocks from the Stadium Armory station, and that Swinson had been at home from 2:30 a.m. until 6:00 .a.m. on October 6th. At the time of his arrest, Swinson so stated to the arresting officer; but when confronted with the fact that at 2:30 a.m. that morning he had been cited for a traffic violation while driving the pickup truck across town from his wife's residence, Swinson stated that he had in fact been with his girlfriend, and not with his wife. Swinson later denied making this statement to police.

### Arguments on Appeal

Both appellants advance several arguments on appeal. First, they contend that a metro station is not a building for purposes of the second-degree burglary statute, D.C.Code § 22–1801(b) (1981). That section provides, in relevant part:

> [W]hoever shall, either in the night or in the daytime, break and enter, or enter without breaking, any dwelling, bank, store, warehouse, shop, stable, or other building or any apartment or room, whether at the time occupied or not, or any steamboat, canalboat, vessel, or other watercraft, or railroad car or any yard where any lumber, coal, or other goods or chattels are deposited and kept for the purpose of trade, with intent to break and carry away any part thereof or any fixture or other thing attached to or connected with the same, or to commit any criminal offense, shall be guilty of burglary in the second degree.

The trial court found that the activity within the metro station makes it a "store," and therefore held the statute applicable to the criminal acts alleged to have been committed by appellants. On appeal, both Barnes and Swinson contend that the trial court's determination was erroneous. They further argue that the metro station is also not an "other building" within the meaning of the statute. We find it unnecessary to determine whether a metro station qualifies as a store, for we find that the plain meaning of the word "building" encompasses this type of structure, and therefore burglary of a metro station may be prosecuted under section 1801(b).

The common law offense of burglary, defined as the breaking and entering of a dwelling at night with the intent to commit a felony, no longer exists in the District of Columbia: it has been replaced by a statutory crime as defined in D.C.Code § 22–1801 (1981). *United States v. Kearney*, 162 U.S.App.D.C. 110, 112, 498 F.2d 61, 63 (1974). The much broader definition of burglary found in section 1801 is in derogation of the common law, and the statute is therefore to be construed strictly. *United States v. Evans*, 30 App.D.C. 58, 62 (1907), *cert. quashed*, 213 U.S. 297, 29 S.Ct.

507, 53 L.Ed. 803 (1909). It is a basic principle of statutory construction, however, that the plain and ordinary meaning of a word used in a statute is the meaning intended by the legislature, absent legislative history or other indication to the contrary. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

■ The dictionary definition of the word "building" is "a thing built ... a constructed edifice designed to stand more or less permanently ... usually covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 292 (1969). Both the Rhode Island Avenue and Stadium Armory metro stations are "useful structures" that were "built"; each is "more or less completely enclosed by walls," covered by a roof, and intended for permanent use. Appellants suggest that the Stadium Armory station is not a building because it is below ground; they further argue that the ingress and egress of trains along with the large pedestrian entrances and exits are characteristics that take both the Rhode Island and Armory stations out of the "building" category. The plain meaning of the term "building," however, is not confined to structures built above ground (although those, of course, are our normal experience), and therefore the fact that the Armory station is below ground is immaterial. Further, the pedestrian walkways of both stations were closed and locked at the time of the events in question. The argument that a metro station is not a "building" because it is connected to other stations via train tunnels is frivolous; had appellants burglarized Union Station they could not be heard to argue that, because Union Station is connected to New York's Pennsylvania Station via railroad tracks, they could not be prosecuted under section 1801(b). For all of these reasons we hold that the burglary statute covers the breaking and entering of a metropolitan transit station, and therefore we find no error in the charging of both appellants with second-degree burglary.

Appellants further argue that there was insufficient evidence to sustain their convictions for the October 6th metro station burglary. Both argue that the prosecution proved only their presence at the scene of the crime, together with their attempted flight, and contend that this circumstantial evidence is insufficient to sustain a finding of guilt beyond a reasonable doubt.

■ Appellants' summary of the evidence is incomplete. Both Barnes and Swinson were identified by Officer Pressley, who testified that she observed Swinson under a light at the top of the Armory station's escalator shaft from a distance of 25 feet, and that she obtained a clear view of Barnes as he ran in front of her squad car headlights. Both Barnes and Swinson were apprehended only minutes after Officer Pressley observed them at the scene, both within three blocks of the entrance to the Stadium Armory station. Both Barnes and Swinson attempted to escape. The clothing found in the pickup truck driven by Swinson matched the clothing Officer Pressley had identified as worn by the man she had seen at the top of the escalator. Twenty-seven empty coin wrappers were also found in the truck. The prosecution proved Barnes' alibi defense to be false. Swinson's inconsistent statements to the police, first stating that he had been with his wife that morning, and then stating that he had been with his girlfriend, undermined his alibi defense. In summary, there was ample evidence presented at trial based upon which the jury could conclude that both Barnes and Swinson were guilty of the October 6th offense beyond a reasonable doubt.

■ Finally, appellant Swinson claims that the hatchet recovered from the bed of the pickup truck should not have been admitted into evidence because the connection between the hatchet and the defendant or the crime is too conjectural, citing *Burle-*

**1164**

.son v. United States, 306 A.2d 659, 661 (D.C.1973). This contention is without merit. Demonstrative evidence of this type is admissible if it is capable of "affording a reasonable inference as to a matter in dispute. The evidence must have some connection with the defendant or the crime with which he is charged." *Oesby v. United States,* 398 A.2d 1, 10 (D.C.1979) (citing *Burleson, supra,* 306 A.2d at 661). Whether evidence should be excluded as more prejudicial than probative is a decision committed to the sound discretion of the trial court. *See Willcher v. United States,* 408 A.2d 67, 75 (D.C.1979). The government's locksmith witness testified that the likely took used to break into the farecard machine was an axe, a chisel, or a hatchet. The hatchet therefore tended to prove that Swinson had the means with which to break into the machine. A second hatchet was recovered from beside the escalator shaft, further supporting the inference that hatchets were used to do the job. Additional evidence incriminating Swinson—the empty coin wrappers and the lookout's clothes—were also recovered from the same truck. Prior to the burglary, the truck had been reported to police as suspiciously parked in an alley one-half block from the Armory station. There was no abuse of discretion in the admission of this evidence.

For all of the above reasons, the convictions of both appellants are hereby

*Affirmed.*