*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-1378

LEVI RUFFIN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-13804-14)

(Hon. Rhonda Reid-Winston, Trial Judge)

(Argued  January 16, 2018          Decided  November 21, 2019)

*Debra Soltis*, with whom *Paul Y. Kiyonaga* and *Marcus Massey* were on the brief, for appellant.

*Kristina Ament*, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Kenechukwu O. Okocha*, *Akhi Johnson*, and *Eric S. Nguyen*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and FERREN, *Senior Judge*.

GLICKMAN, *Associate Judge*:   Appellant, Levi Ruffin, was convicted after a jury trial of the following offenses:  first-degree burglary while armed; kidnapping while armed; third-degree sexual abuse while armed; attempted robbery while armed; assault with a dangerous weapon; and assault with significant bodily injury.

In this appeal, he contends the evidence was insufficient to sustain his convictions for first-degree burglary and kidnapping, and that the trial court erred in denying his motions to exclude DNA test results and a knife found in his possession at the time of his arrest. Concluding that these contentions lack merit, we affirm appellant's convictions.

## I.  The Evidence at Trial

The complaining witness at appellant's trial, whom we shall refer to as J.C., testified that a man wielding a silver folding knife attacked her when she arrived home on the evening of September 14, 2013. J.C. lived at the time in one of three apartments in a row house in Northwest Washington, D.C. Her assailant, who was later identified as appellant, came up behind her as she was unlocking the front door to the building. Putting his hand over her mouth and holding the knife to her face, appellant told her not to move and to drop what she was holding. He then pushed J.C. through the entrance into the common hallway of the row house, followed her in, and closed the door behind them. Alone with her in the hallway, and continuing to hold the knife to her face, appellant demanded her money. J.C. started to hand him her debit and credit cards, but appellant slapped them away.

He then lifted her dress and rubbed his fingers against her genital area through her underwear.

At that point, J.C. grabbed the hand in which appellant was holding the knife and pushed him away. A fight ensued, during which appellant bit J.C. on her left cheek and her back. She yelled at him to stop. He pushed her to the floor and fled out the front door of the row house. After he was gone, J.C. went into her apartment and called the police.

A neighbor in an apartment down the hallway heard and saw part of the attack through the peephole of her door and called the police. The recording of that call was played at trial. It captured over 90 seconds of the assault.

J.C. was taken to the hospital by ambulance. She was treated for the bite wounds on her cheek and back, and for a lacerated finger (which required six stitches) and other knife cuts on her hands. A nurse swabbed J.C.'s bite wounds for biological evidence that could help identify her attacker.

After several months, the police acquired information linking appellant to the assault.[1] In August 2014, officers went to his apartment to arrest him. In a pair of jeans that appellant asked to put on, the officers found a folding knife with a silver blade and a black handle. Over appellant's objection to its relevance, this knife was admitted in evidence against him at trial, along with the parties' stipulation that it had been in appellant's possession "as early as November 2, 2013" (i.e., about seven weeks after the assault on J.C.).[2]

DNA testing identified appellant as J.C.'s assailant. Two forensic scientists from the District of Columbia Department of Forensic Sciences (DFS) testified that they received and tested the swabs taken from J.C.'s cheek and back wounds and a swab taken from appellant's cheek following his arrest in this case. These scientists performed the extraction, quantification, and amplification of DNA from each of those sources and generated DNA profiles from them for subsequent interpretation and comparison. They did not testify to that interpretation and

---

[1] The nature of this information was not disclosed to the jury in order to avoid potential prejudice to appellant.

[2] The stipulation was based on the fact that Mr. Ruffin had the knife in his possession when he was arrested in November 2013 in connection with a matter unrelated to this case. (The jury was not informed of this arrest.) The knife was recorded at that time as appellant's property. It was returned to appellant because his possession of it was not unlawful.

comparison, however, because flaws had been detected in DFS's statistical computation procedures. These flaws reportedly "resulted in DFS's overstating the rarity of certain mixture profiles,"[3] i.e., profiles obtained from samples containing DNA from more than one person. A panel of experts convened by the United States Attorney's Office identified "systematic concerns with DFS's interpretations of forensic DNA mixtures,"[4] and an ANSI-ASQ National Accreditation Board (ANAB)[5] audit of DFS likewise found serious problems with its "mixture interpretation procedures." The ANAB required DFS to suspend DNA testing until it corrected the problems.

The government arranged for an accredited private laboratory, Bode Cellmark Forensics (Bode), to interpret and compare the profiles generated by DFS in this case. Over appellant's objection, the court allowed Karin Crenshaw, a forensic biologist at Bode, to testify that appellant's DNA profile matched the

---

[3] *Barber v. United States*, 179 A.3d 883, 892 (D.C. 2018) (internal quotation marks omitted).

[4] *Id.* at 891-92.

[5] "ANSI" and "ASQ" refer to the American National Standards Institute and the American Society for Quality.

foreign DNA profiles recovered from the swabs of J.C.'s back and cheek wounds.[6] According to Ms. Crenshaw, the probability of randomly selecting an unrelated African American with the same profile as that of the foreign DNA from J.C.'s back was 1 in 450 quadrillion; and the equivalent random match probability for the DNA from J.C.'s cheek was 1 in 4.1 sextillion.[7]

## II. Sufficiency of the Evidence

Appellant claims the evidence was insufficient to convict him of the first-degree burglary and kidnapping charges. Each claim turns on a question of statutory interpretation.

### A. First-Degree Burglary While Armed

The crime of burglary in the first degree is defined in D.C. Code § 22-801(a) (2019 Supp.) in pertinent part as follows (emphasis added): "Whoever shall . . .

---

[6] In the profiles derived from J.C.'s wounds, Ms. Crenshaw found DNA from only one source (the "foreign" source) besides J.C. herself.

[7] J.C.'s description of her assailant had included the fact that he was a Black man, and appellant met her description. According to Ms. Crenshaw, the probability of finding an unrelated Hispanic or Caucasian with the foreign DNA recovered from J.C. was even more remote.

enter . . . *any dwelling*, or room used as a sleeping apartment in any building, with intent . . . to commit any criminal offense, shall, if any person is in any part of such dwelling or sleeping apartment at the time of such . . . entering, . . . be guilty of burglary in the first degree."[8] Appellant contends there was insufficient proof that he entered a "dwelling" to support his conviction of this crime because the evidence at trial established that J.C.'s assailant entered only the common hallway of her multi-apartment row house (and not also her or any other tenant's individual apartment). Appellant asserts that the common hallway of a residential apartment building is not part of a "dwelling" as that term is used in the burglary statute.

The burglary statute does not define the term "dwelling," and this is the first time this court has been called upon to construe it. Its meaning in the statute, and whether it encompasses a common hallway in a multi-unit residential building, are questions of statutory interpretation that we decide *de novo*.[9] Where, as here,

---

[8] *See also Marshall v. United States*, 623 A.2d 551, 557 (D.C. 1992) ("In order to prove armed first degree burglary, the government must establish beyond a reasonable doubt, an armed entry . . . into an occupied dwelling with the intent to commit a crime therein."); *Edelen v. United States*, 560 A.2d 527, 529 (D.C. 1989) ("The intent of the legislature in regard to § 22-1801(a) [now codified as § 22-801(a)] is clear from the ordinary meaning of its words; the statute seeks to punish any entry, with the intent to commit a crime, of a dwelling at a time when another person is located anywhere within the confines of that dwelling.").

[9] *Williams v. Kennedy*, 211 A.3d 1108, 1110 (D.C. 2019).

statutory terms are undefined, we presumptively construe them according to their ordinary sense and plain meaning, taking into account the context in which they are employed, the policy and purpose of the legislation, and the potential consequences of adopting a given interpretation.[10] "We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent."[11] These principles have guided our interpretation of other language in the first-degree burglary statute.[12] They favor giving the term "dwelling" a broad interpretation that would render § 22-801(a) applicable here.

To begin with, the term "dwelling" is not limited to single-family occupancies. Apartment houses and other multi-unit residential structures also are included within standard dictionary definitions of "dwelling," particularly when that word is used in burglary and similar statutes. Black's Law Dictionary, for example, states that "dwelling" is the short form of "dwelling-house," a term

---

[10] *See id.*; *Chase Plaza Condo. Ass'n v. JPMorgan Chase Bank, N.A.*, 98 A.3d 166, 172 (D.C. 2014); *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011).

[11] *Williams*, 211 A.3d at 1110 (quoting *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019)).

[12] *See Edelen*, 560 A.2d at 529; *see also Swinson v. United States*, 483 A.2d 1160, 1163 (D.C. 1984) (construing the word "building" in the second-degree burglary statute, then D.C. Code § 22-1801(b), which is now codified as § 22-801(b)).

meaning, in criminal law, virtually any "building . . . , part of a building . . . , or []other enclosed space that is used or intended for use as a human habitation."[13] We think it informative and noteworthy that a number of federal courts, tasked under the Sentencing Guidelines with determining the "generic" meaning of "burglary of a dwelling," have accepted this definition.[14]

In construing the District's first-degree burglary statute, we have no reason to reject the broad ordinary meaning of "dwelling" as any enclosed space used for human habitation, nor any reason to narrow the definition of "dwelling" to exclude some types of habitation. Section 22-801(a) states that it applies to entries into "*any* dwelling" without qualification or exception. "[T]here is no indication in the legislative history to the contrary."[15] Congress enacted the first-degree burglary statute in 1967.[16] As explained in the report on the bill by the Senate Committee on the District of Columbia, up until then, "the crime of breaking and entering in

---

[13] *Dwelling-House*, BLACK'S LAW DICTIONARY (11th ed. 2019). This definition adds that the term "typically includes . . . structures connected . . . by an enclosed passageway."

[14] *See United States v. Garcia-Martinez*, 845 F.3d 1126, 1131-32 (11th Cir. 2017) (citing cases).

[15] *Edelen*, 560 A.2d at 529 (footnote omitted).

[16] District of Columbia Crime Act of 1967, Pub. L. 90-226, tit. VI, § 602, 81 Stat. 736 (1967).

the District of Columbia [was] called housebreaking" and did "not distinguish between dwellings and other premises."[17]  The authorized penalty for housebreaking, imprisonment for up to 15 years, was the same regardless of the character of the premises.[18]  The 1967 enactment amended the housebreaking statute to create two degrees of burglary and specify different minimum sentences for each.[19]  The graver offense, first-degree burglary of an occupied dwelling or sleeping apartment, carried an enhanced penalty of no less than 5 nor more than 30 years of imprisonment.  Burglaries of other premises were covered by the second-degree statute, which tracked the previous housebreaking statute and continued to carry a maximum penalty of 15 years' imprisonment.[20]

Accepting the broad, ordinary definition of "dwelling" best serves the evident legislative purpose behind the enactment of the first-degree burglary statute.  Burglaries of occupied residences are singled out for heightened punishment because they "pose an increased risk of physical and psychological

[17]  S. Rep. No. 90-912, at 21 (1967).  The previous housebreaking statute was enacted in 1901, *see* 31 Stat. 1323, ch. 854, § 823 (1901), and was codified in 1967 as D.C. Code § 22-1801.

[18]  *Id.*

[19]  S. Rep. No. 90-912, at 21, 28.

[20]  *Id.*; *see* D.C. Code § 22-801(b).

injury."[21]  In such burglaries "there is a much greater possibility of confronting the resident and a substantial risk that force will be used and that someone will be injured, than if one burglarized a building that was not intended for use as habitation, such as an office building after office hours or a warehouse."[22]  This elevated risk exists whether the human habitation in question is a single-family home or apartment, a row house with a few units, or a multi-unit apartment building.  "[T]he unique wounds caused by residential burglary are independent of the size or construction of the dwelling.  They are the same for the mansion house and the boarding house, the tract home and the mobile home."[23]

So J.C.'s row house was a "dwelling" within the meaning of our first-degree burglary statute.  The evidence clearly sufficed to prove that her assailant entered this dwelling with the intent to commit a crime inside it, and that someone else was present there when he did so.  This latter statutory requirement, which is not in dispute, was satisfied in two ways.  First, it suffices that J.C.'s neighbor was in the row house even though she was in her own apartment; a residential burglary

---

[21]  *United States v. Rivera-Oros*, 590 F.3d 1123, 1130 (10th Cir. 2009) (quotation marks omitted).

[22]  *United States v. McClenton*, 53 F.3d 584, 588 (3d Cir. 1995).

[23]  *Rivera-Oros*, 590 F.3d at 1130.

violates § 22-801(a) "if any person is in any part of [the] dwelling" at the time of entry. Second, as in *Edelen*, this requirement also was met (even if no one else had been in the building at the time) because J.C.'s assailant pushed her into the row house ahead of him and she therefore was in the dwelling herself when he followed her in.[24]

It is immaterial that the entry and the subsequent assault went no further than the interior common hallway of the row house. This hallway was behind a locked door; in no way was it a space so open to the public at large as to be considered outside and not part of the private dwelling area. And as far as § 22-801(a) is concerned, an entry is an entry; it does not matter where in a dwelling the invasion occurs, for all such intrusions pose the heightened risk of violent confrontation and other harms that the first-degree statute is meant to deter and punish. We thus readily agree with the holdings of several other courts that, under burglary statutes

---

[24] The defendant in *Edelen* argued that he could not be convicted of first-degree burglary of the complainant's apartment based on evidence that he forced the complainant into it at gunpoint and followed her inside with the intent to rape her. He argued that his entry into the apartment was not a first-degree burglary because the complainant was not "occupying" the apartment when he encountered her outside it and ordered her to go in. We rejected that argument and held it sufficed to prove first-degree burglary that the complainant preceded Edelen into the apartment and was "in" it at the time he stepped in. 560 A.3d at 529-30.

comparable to ours, "an apartment dweller's 'dwelling house' does include secured common hallways."[25]

Appellant argues that this conclusion is foreclosed by our decision in *Edelen*, in which this court held that the defendant committed first-degree burglary when he entered the complainant's apartment, even though he began his attack on her in the common hallway outside her apartment.[26] This argument is not correct. In *Edelen*, this court had no occasion to consider, and therefore did not consider, whether the defendant committed a first-degree burglary when he entered the apartment building. The issue before the court was only whether his entry into the apartment constituted a first-degree burglary. The two possibilities are not

---

[25] *Commonwealth v. Goldoff*, 510 N.E.2d 277, 281 (Mass. App. Ct. 1987); *id.* at 280 ("When this historical right to security in one's place of habitation is considered in the context of contemporary multi-unit residential structures, we can think of no reason why that right should not apply to tenants who reach their apartment units by a common hallway which they have collectively secured from the general public by a locked door. . . . These [common] areas are not open to the public; they comprise a portion of each occupant's dwelling house. The criminal who unlawfully enters there violates the habitation of each of them, and each is endangered by the possibility of confronting him or her[.]"); *see also, e.g.*, *State v. Bowman*, 311 S.W.3d 341, 345-47 (Mo. Ct. App. 2010) (citing cases from other jurisdictions and concluding that "the common areas in an apartment building can constitute part of the apartment . . . as long as the common area in question is a secured area not otherwise open to the public.").

[26] See footnote 24, *supra*.

mutually exclusive. Section 22-801(a) recognizes both possibilities by specifying that a first-degree burglary can be committed by entering either "any dwelling" *or* any "room used as a sleeping apartment in any building."

We reject appellant's restrictive interpretation of D.C. Code § 22-801(a) and hold that the evidence was sufficient to sustain his conviction for first-degree burglary.

## B. Kidnapping While Armed

To convict appellant of kidnapping J.C. in violation of D.C. Code § 22-2001 (2019 Supp.), the government had to prove that he "intentionally seized, confined, or carried [her] away, and that [he] held or detained [her] against her will."[27] There was ample evidence that appellant did all of those things by forcing J.C. into the hallway of her row house, closing the door behind him, detaining her there at knifepoint, and violently resisting her attempt to escape. Appellant contends, however, that there was insufficient evidence to sustain his kidnapping conviction

---

[27] *Kaliku v. United States*, 994 A.2d 765, 787 (D.C. 2010); *see also Hughes v. United States*, 150 A.3d 289, 306 (D.C. 2016) ("The essence of the crime of kidnapping is the involuntary nature of the seizure and detention." (internal punctuation omitted)).

because J.C.'s detention lasted only about a minute-and-a-half and was "incidental" to and "wholly coextensive with" the assault and attempted robbery. Appellant argues that offenses like robbery and sexual assault almost always include some detention of the victim (though detention is not an element of them), and the legislature could not have intended the kidnapping statute to apply to such detentions that are "not distinct from another offense" of which the defendant is guilty.[28]

This argument is not a new one. It has been made to us before, and we have rejected it. As this court stated in *Richardson*, the argument is "foreclosed" by "binding precedent."[29] We have held that "[t]he plain language" of D.C. Code § 22-2001

---

[28] *Richardson v. United States*, 116 A.3d 434, 438 (D.C. 2015).

[29] *Id.* In support of this statement, *Richardson* cited *Hagins v. United States*, 639 A.2d 612, 617 (D.C. 1994) (rejecting argument that defendant charged with rape could not be convicted of kidnapping if the alleged "confinement" was incidental to the sexual assaults, because "'non-coextensive' (or 'non-incidental') confinement" is not a statutory element of the crime of kidnapping). *See also Spencer v. United States*, 132 A.3d 1163, 1173 (D.C. 2016) ("In *Richardson*, we conclusively held that 'non-incidental' confinement is not an element of kidnapping in the District of Columbia. . . . *Richardson* expressly denies that the incidental nature of a detention is relevant to the sufficiency of a kidnapping conviction in the District[.]"). We reject appellant's argument that these cases did not decide the question because the court also held in each of them that even if proof of "non-incidental" detention were required for kidnapping, the evidence

*(continued…)*

contains no exception for cases in which the conduct underlying the kidnapping is momentary or incidental to another offense. . . . "[T]here is no requirement that the victim be moved any particular distance or be held for any particular length of time to constitute a kidnapping; all that is required is a 'seizing, confining' or the like and a 'holding or detaining for ransom or reward 'or otherwise'"[30]

Accordingly, we hold that the evidence in this case was sufficient to sustain appellant's conviction for kidnapping while armed.

## III. Evidentiary Rulings

### A. Admission of Expert Witness Testimony on DNA Match

Appellant argues that the trial court erred in denying his pretrial motion to preclude testimony by a DNA expert witness from Bode (Ms. Crenshaw) that was

*(…continued)*
would have been sufficient to sustain the kidnapping convictions at issue. "[W]here a judgment rests on two independent and alternative rationales, both rationales are holdings rather than dicta, even though strictly speaking neither rationale would be essential to the resolution of the case." *Parker v. K & L Gates, LLP*, 76 A.3d 859, 878 (D.C. 2013) (McLeese, J., concurring) (citing *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949), and *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 340 (1928)).

[30] *Richardson*, 116 A.3d at 439 (quoting *West v. United States*, 599 A.2d 788, 793 n.9 (D.C. 1991)).

based on unreliable DNA testing data generated by DFS. "We review a trial court's admission or exclusion of expert testimony for abuse of discretion and only disturb the lower court's ruling when it is 'manifestly erroneous.'"[31] Under Federal Rule of Evidence 702, which now governs the admissibility of expert opinion testimony in our courts,[32] the court may allow such testimony based on a preliminary determination of its evidentiary reliability.[33] The factors the court must consider in assessing reliability include whether the testimony is "based on sufficient facts or data"[34] and is the product of "reliable principles and methods" that "the expert has reliably applied . . . to the facts of the case."[35]

---

[31] *Dickerson v. District of Columbia*, 182 A.3d 721, 726 (D.C. 2018) (quoting *Benn v. United States*, 978 A.2d 1257, 1273 (D.C. 2009)).

[32] This court adopted Rule 702 in *Motorola, Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc). Although this decision was rendered after appellant's trial, we since have held that the holding of *Motorola* applies retroactively to cases already tried but not yet final on direct appeal. *See Williams v. United States*, 210 A.3d 734, 743 (2019).

[33] *Motorola*, 147 A.3d at 754 ("[T]he trial judge must . . . ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

[34] Fed. R. Evid. 702(b).

[35] *Id.* 702(c), (d).

Federal Rule of Evidence 703, which this court also has adopted,[36] permits an expert to base an opinion on otherwise inadmissible facts or data of which the expert has been informed "[if] experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." In other words, "the opinions of an expert witness may be based in part on hearsay or other inadmissible information as long as the hearsay or other inadmissible information meets minimum standards of reliability and is of a type reasonably (i.e. customarily) relied on in the practice of the expert witness's profession."[37] While the court may not abdicate its gatekeeping responsibility to ensure the evidentiary reliability of expert testimony, it typically must "accord an expert wide latitude in choosing the sources on which to base his or her opinions."[38] In general, "a properly qualified expert is assumed to have the necessary skill to evaluate any

---

[36] *See Motorola*, 147 A.3d at 754 n.7; *In re Melton*, 597 A.2d 892, 901 & n.10 (D.C. 1991) (en banc).

[37] *In re Amey*, 40 A.3d 902, 910 (D.C. 2012).

[38] *Melton*, 597 A.2d at 903. *See also Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) ("[E]xperts in various fields may properly rely on a variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion.")

second-hand information and to give it only such probative force as the circum-stances warrant."[39]  Therefore, "[i]n most cases, . . . objections to the reliability of out-of-court material relied upon by [an expert] will be treated as affecting only the weight, and not the admissibility, of the [expert testimony]."[40]

Applying the foregoing principles, we conclude that the trial court did not abuse its discretion by denying appellant's motion to preclude Ms. Crenshaw's testimony.  In his motion, appellant cited the criticism of DFS by the ANAB and the government's panel of experts; argued that Bode could not "attest to the accuracy" of DFS's DNA test results; and asserted (without evidence) that "it is not customary for an analyst from one DNA lab to simply review" and draw conclusions from raw test data provided by another lab.  But the government

---

[39] *Melton*, 597 A.2d at 903.  *See also Kinser v. Gehl Co.*, 184 F.3d 1259, 1275 (10th Cir. 1999), abrogated on other grounds by *Weisgram v. Marley Co.*, 528 U.S. 440 (2000) (describing the rationale under Rule 703 for allowing experts to testify to opinions based on evidence that is itself inadmissible as premised on the notion that "experts in the field can be presumed to know what evidence is sufficiently trustworthy and probative to merit reliance.").

[40] *Melton*, 597 A.2d at 903-04.  *See also Hose v. Chicago N.W. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

successfully rebutted these contentions. It proffered the ANAB audit report and other documentation showing, as the court found, that the criticisms of DFS pertained only to its statistical interpretation of DNA data, not DFS's procedures for generating that data.[41] The court was given no reason to think that the data furnished by DFS to Bode was unreliable. In addition, the government provided an affidavit in which Natalie Morgan, Bode's Director of Forensic Casework, averred that "independent analysis and review of another Lab's data is routinely completed in the forensic DNA field," and that Bode itself performs such "independent analysis/interpretation" in 20-30 cases per year.[42] No evidence contradicted this averment. It supported the court's finding that, contrary to appellant's assertion, the data furnished by DFS was "the type of evidence that experts customarily rely on."

---

[41] The report prepared by the panel of experts convened by the United States Attorney's Office was not submitted to the trial court in this case and is not in the record before us. In its stead, the government submitted a copy of a discovery letter conveying the substance of the panel report and also reporting that a member of the panel had reviewed DFS's work in this particular case and had "concluded that there were no specific issues which impact the DNA results." *See also* *Barber*, 179 A.3d at 893-94 (explaining that none of the concerns with DFS's work "cast doubt on DFS's actual *testing* of the DNA samples in this case or any other case sampled").

[42] Ms. Morgan defined "analysis/interpretation" as including "making comparisons" between DNA profiles.

At trial, appellant was able to cross-examine the government's three expert witnesses to identify any problems with the data and challenge the reliability of the DNA testing and analysis. The jury received an accurate picture of each expert's role. All three witnesses agreed that the issues raised by ANAB did not concern the procedures followed by the two DFS witnesses to generate the "raw data" sent to Bode in this case. Appellant elicited no evidence to the contrary. The two DFS witnesses described in detail the steps they followed to generate that raw data, including the measures followed to ensure the reliability of the results. Ms. Crenshaw testified that these steps were shown in the data she received and reviewed, and that it would have been evident to her from the "raw data" if those steps had been performed improperly. She found no problems or irregularities. This testimony was not impeached or contradicted.

We conclude that the trial court did not abuse its discretion in allowing Ms. Crenshaw to testify, and in trusting the jury to evaluate the reliability of her opinion and the information on which it was based.

**B. Admission of the Knife**

Appellant contends the trial court erred by admitting the knife recovered from his jeans pocket into evidence. He argues that the knife was irrelevant

because it did not match J.C.'s description of the one her assailant used and there was no other proof linking the knife to the assault. In overruling appellant's objection to the knife's relevance, the trial court found that the discrepancy between J.C.'s description and the appearance of the knife went to the weight of the evidence but did not render it inadmissible. We agree.

"Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[43] "The trial court enjoys particularly broad discretion in determining the relevance of a piece of evidence because the inquiry is fact-specific and proceeds under a flexible standard."[44] Such a "highly discretionary" determination "will be upset on appeal only upon a showing of grave abuse."[45] We can find no such abuse here.

"An accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore

---

[43] *Plummer v. United States*, 813 A.2d 182, 188 (D.C. 2002) (quoting *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992)).

[44] *Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014).

[45] *Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010) (internal quotation marks and citations omitted).

admissible."[46]  It is relevant and admissible as "direct and substantial proof of the crime charged"[47] if the weapon is "linked to both the defendant and the crime" and the connection is not "too remote or conjectural."[48]  In this case, two factors bear on the issue of relevance – whether the knife's appearance matched J.C.'s description, and whether appellant was in possession of it around the time of the crime.[49]

As to the first factor, J.C. reported that her assailant wielded a silver folding knife.  The knife recovered from appellant's jeans was a folding knife with a silver blade and a black handle.  Although J.C. did not mention a black handle, the court reasonably could find that the recovered knife matched J.C.'s general description,

---

[46]  *Coleman v. United States*, 379 A.2d 710, 712 (D.C. 1977).  Our cases repeatedly have recognized this point.  *See, e.g.*, *Jones v. United States*, 127 A.3d 1173, 1185 (D.C. 2015); *Daniels v. United States*, 2 A.3d 250, 262 (D.C. 2010); *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000).

[47]  *Jones*, 127 A.3d at 1184.

[48]  *King v. United States*, 618 A.2d 727, 728-29 (D.C. 1993) (quotation marks omitted).

[49]  *Jones*, 127 A.3d at 1185 ("Ultimately, the admissibility of evidence of a defendant's prior possession of the weapon or type of weapon used in a charged offense turns on a consideration of the temporal proximity of the incidents of prior possession to the charged offense and a comparison of the appearance of the weapon previously possessed by the defendant with that of the weapon actually used in the charged offense.").

especially given the obvious likelihood that the handle of the knife was not clearly visible to J.C. when her attacker was grasping it and threatening her with it.[50] Appellant argues that J.C. was not shown appellant's knife and never identified it as being, or looking like, the knife held by her assailant. The absence of such an identification does not diminish the probative value of the fact that the knife fit J.C.'s general description of the weapon. As to the second factor, although the police did not find the knife until they arrested appellant eleven months later, appellant stipulated that he had it in his possession at a time only seven weeks after the crime was committed. This was not so long after the crime as to deprive the evidence of any probative value.[51] We think the trial court fairly could conclude from these facts that appellant's possession of the knife was "some evidence of the probability of his guilt" and therefore relevant.[52] "It is true that the evidence established only a reasonable probability, and not a certainty," that appellant

---

[50] *See, e.g.*, *Williams v. United States*, 106 A.3d 1063, 1069 (D.C. 2015) (upholding admission of evidence that the defendant's weapon met "the same general description as the one used in the charged offense"); *Daniels*, 2 A.3d at 254, 262 (upholding admission of testimony that defendant had been seen with a black gun and a silver gun where witnesses had described murder weapon as either black or silver).

[51] In some cases, evidence of a defendant's possession of the weapon used in a charged offense has been held admissible even though many months separated the possession from the crime. *See Jones*, 127 A.3d at 1186 (citing cases).

[52] *Busey*, 747 A.2d at 1165 (quotation marks omitted).

possessed the knife used in the assault on J.C.[53] "But the connection of the [knife] with the [assault] was not 'conjectural and remote,' . . . and so the lack of certainty goes to the weight of the evidence, not its admissibility."[54]

Appellant argues that any probative value the knife had was outweighed by the danger of prejudice, which he identifies on appeal only as the implication that "he was a violent man who carried a knife."[55] Appellant faults the trial judge for failing to balance the danger of such prejudice against the limited probative value of the knife.

The point is not well-taken, however. "In general, if evidence is relevant, it should be admitted unless it is barred by some other legal rule."[56] In other words, upon a finding of relevance, the knife was presumptively admissible. It is true that relevant evidence may be excluded, in the trial court's discretion, if the court finds that its probative value is *substantially* outweighed by a danger of unfair

---

[53] *Id.*

[54] *Id.* (quoting *Burleson v. United States*, 306 A.2d 659, 662 (D.C. 1973)).

[55] Brief for Appellant at 43.

[56] *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014).

prejudice.[57] Thus, if a defendant identifies a risk of unfair prejudice from proffered evidence and explains how that risk outweighs the probative value of the evidence, the judge must balance the probative value of the evidence against that risk. But "[j]udges are not clairvoyant."[58] The responsibility to identify the risk and raise the issue of unfair prejudice with specificity for the judge's consideration is on the party seeking protection from it – meaning, in this case, on appellant.[59] It is not the judge's role to assume that responsibility, snoop out the facts, and construct the argument for the litigant. Yet when the relevance of the knife was argued and decided in this case, appellant did not argue that it posed any risk of unfair

---

[57] *Johnson v. United States*, 683 A.2d 1087, 1100 (D.C. 1996) (en banc) (adopting Federal Rule of Evidence 403). The term "unfair prejudice" means the evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Comford v. United States*, 947 A.2d 1181, 1187 (D.C. 2008) (citations omitted).

[58] *Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013).

[59] *See Comford*, 947 A.2d at 1188-89 (holding that defendant did not preserve Rule 403 claim "effectively" where, though he cited the Rule, he gave the trial judge "no reason at all why" the testimony he moved to exclude "would be irrelevant or unfairly prejudicial, or why the risk of unfair prejudice would substantially outweigh its probative value"); *see also Williams*, 724 F.3d at 962 (claim that trial court erred by admitting evidence without balancing its probative value against prejudice as required by Rule 403 *held* forfeited where motion in limine "did nothing more than give a barebones recitation of the relevant standard" and "then conclusorily state that it was met" with no explanation of "how or why the balancing test should result in exclusion").

prejudice at all.[60]   Nor, in our view, was any such risk apparent.   Contrary to appellant's unsupported claim (made for the first time on appeal), appellant's mere possession of the (concededly lawful) knife did not brand him as a "violent" individual.   The knife was not inflammatory evidence calculated to appeal to the jury's emotions and prejudice the jury against appellant.   And as the judge stated when rendering her decision that the knife was relevant, appellant could challenge its probative value through cross-examination.

We conclude that the trial court did not abuse its discretion by admitting the knife into evidence.

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court.

---

[60] Appellant's written motion to exclude the knife contained nothing beyond a perfunctory, half-sentence assertion in passing that "introduction of the knife is more prejudicial than probative."   The issue of prejudice versus probative value was not mentioned at all in the argument on the motion.